# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## ON MOTION FOR REHEARING

### NO. 03-11-00669-CV

**Tom Bennett and James B. Bonham Corp., Appellants**

**v.**

**Larry Wayne Grant, Appellee**

### FROM THE DISTRICT COURT OF SAN SABA COUNTY, 33RD JUDICIAL DISTRICT NO. 8086, HONORABLE GUILFORD L. JONES III, JUDGE PRESIDING

### O P I N I O N

We withdraw the opinion dated August 13, 2014, and the supplemental opinion and judgment dated September 26, 2014, and substitute the following opinion and judgment in their place. We deny the Appellants' motion for rehearing.

This suit arises from a now infamous feud between neighboring cattle ranchers in San Saba, the details of which have been thoroughly relayed in prior opinions of this Court and the Texas Supreme Court. *See Bennett v. Reynolds*, 242 S.W.3d 866 (Tex. App.—Austin 2007), *rev'd & remanded in part by* 315 S.W.3d 867 (Tex. 2010) (*Bennett I*). The feud between cattle ranchers Thomas O. Bennett and Randy Reynolds has many turbulent twists and turns, *see id*., but the gist of the dispute and subject of prior appeals involved allegations that thirteen head of cattle

belonging to Reynolds had wandered onto Bennett's ranch, and that instead of returning them in a neighborly fashion, Bennett ordered his ranch hand—Larry Grant—to round up the cattle and sell them at auction. Grant testified that he raised concerns with Bennett that the cattle did not belong to him, but Bennett ignored his concerns.[1] Worried that he could be implicated in cattle theft, Grant purchased a disposable camera and took several photos of the cattle loaded on Bennett's trailer prior to the sale. Within two months of the sale, Grant left his employment with Bennett but kept the secret photos stashed away in a box in his home where they were seemingly forgotten and left undisturbed for almost a year. Reynolds, however, eventually learned of the secret photos after a chance encounter with Grant's brother-in-law and demanded that Grant turn the photos over to the authorities. What happens next is hotly disputed and the subject of litigation between Bennett and his former ranch hand, Grant, which gave rise to this appeal.

After Reynolds attempted to obtain the photos, Grant testified that he was distressed and began drinking beer and smoking marijuana to relieve tension. He then made a series of phone calls to Bennett and Bennett's friend and employee, Don "Ex" Rogers. Grant testified that the purpose of the calls was to inform Bennett of the pictures and give him an opportunity to "make it right" with Reynolds. Bennett and Rogers' version, however, depicts Grant as calling to try and sell the photographs to Bennett. Grant acknowledged he had some discussion with Rogers about selling the photos to Bennett but testified that they only "joked about it." It was no joke, however, when Grant turned the photos over to law enforcement about a month after these conversations and triggered an extraordinary series of events. First, Bennett was indicted for cattle theft based

---

[1] The facts recited herein are taken from the record on appeal.

in part on Grant's testimony and photos. Although ultimately acquitted of the criminal charges, Bennett and his cattle company, the James B. Bonham Corporation, were found liable for conversion in a civil suit brought by Reynolds resulting in a judgment of $5,327.11 in actual damages. The actual damages, however, paled in comparison to the combined exemplary damages of $1.25 million awarded amidst allegations that Bennett had willfully sold his neighbor's cattle to settle a score in a long-standing feud and then attempted to cover his actions by—among other allegations—threatening and bribing witnesses, tampering with the photographs Grant had taken to alter the images of the brands on the cattle to look like his own brand, and even attempting to register his neighbor's brand as his own with the district clerk of San Saba County. Such allegations and such a large exemplary damages award are extraordinary by themselves,[2] but it is only half of the story and less than half of the total liability adjudged against Bennett and the Bonham Corporation from these events.

The other half is the subject of this appeal—a $2.28 million judgment awarded to Grant for a successful malicious prosecution claim brought against Bennett and the Bonham Corporation. This claim arose from Bennett's admitted, yet ultimately unsuccessful, campaign to have Grant imprisoned after he turned the photos over to authorities. In this appeal, Bennett and the Bonham Corporation (collectively, Appellants) contest the judgment in Grant's malicious prosecution suit, contending: (1) legally insufficient evidence supported the malicious prosecution claim; (2) legally and factually insufficient evidence supported the $10,703 awarded in compensatory

---

[2] Indeed, the Texas Supreme Court found the exemplary damages violated due process and remanded the case for remittitur. *See Bennett I*, 315 S.W.3d at 883.

damages; (3) legally insufficient evidence supported the jury's findings allowing for the imposition of exemplary damages over the statutory cap; and (4) the total $2 million exemplary damages award ($1 million against Bennett and $1 million against the Bonham Corporation) violated due process. Individually, the Bonham Corporation raises several arguments challenging its liability in the suit, and Bennett challenges a $269,644.50 sanction. We conclude that the award of exemplary damages failed to comport with due process requirements and required remittitur, but otherwise uphold the trial court's judgment.

## MALICIOUS PROSECUTION

### A.    Background Facts

On the evening of October 4, 2001, telephone records confirm that Grant called and spoke with Bennett for thirteen minutes, but the topic of conversation that evening is hotly disputed by the parties. As previously discussed, Grant testified that he called to inform Bennett about the pictures and to give him an opportunity to "make it right" with Reynolds. Bennett, however, testified that Grant called to try and sell the photos to him for $5,000. What is undisputed, however, is that Bennett waited nearly two years to report his allegations against Grant to the authorities. Indeed, Bennett testified that it was not until after his criminal trial that he decided to report the incident to authorities and acknowledged at trial that his sole "goal" in reporting the incident was to put "Grant in prison . . . for what he's done to me." In furtherance of his goal, Bennett testified he met with law enforcement authorities in four separate counties in an attempt to get Grant indicted for attempted blackmail. After authorities in San Saba County, Llano County, and

4

Coleman County refused to prosecute Grant, Bennett met with the district attorney in Navarro County and requested he prosecute the case.

According to the district attorney's testimony, the following events then transpired. After his initial meeting with Bennett, the district attorney believed that if an attempted blackmail had occurred, it was a federal offense and referred the matter to the federal authorities. Unhappy with this outcome, Bennett again approached the district attorney but this time with a new theory—requesting that Grant be prosecuted for attempted theft. The district attorney informed Bennett he could not bring charges for misdemeanor attempted theft because it was barred by the two-year statute of limitations. Undeterred, Bennett then provided the district attorney with new information, alleging—for the first time—that Grant had attempted to extort money from him a second time within the limitations period. The district attorney testified that he was "skeptical" of this new evidence because it "appeared that there was maybe some tailoring of the facts going on to fit the statute." Indeed, in his sworn testimony in this case, Bennett made no mention of a second attempted blackmail by Grant. Rather, he unequivocally testified that all the factual accusations against Grant occurred in a single evening on October 4, 2011. The district attorney further testified that, based on his conversations with Bennett about the case, he formed the impression that Bennett's motive for prosecuting Grant was to gain an advantage in civil litigation arising from the case. Being "suspicious" of Bennett's new evidence, the district attorney decided to "dig in his heels" and refused to prosecute.

Still undeterred, Bennett met with an attorney who testified that he had represented the Bonham Corporation for over twenty years and that Bennett directed him to research and draft

5

a legal brief advocating that Grant's alleged actions constituted a criminal offense that should be prosecuted. The district attorney testified that it was this brief or another meeting with Bennett that finally was the "catalyst" that prompted him to bring the case to the grand jury. He further testified that it was "rare" for him to bring misdemeanor cases to the grand jury because he himself had the authority to bring misdemeanor charges without grand jury involvement. But, in this case, he finally yielded to Bennett's demands because he did not want to appear "draconian" in his refusal to bring charges. The district attorney may have been finally persuaded to present the case, but the grand jury was not as persuaded and refused to indict Grant.

Frustrated that the grand jury had not indicted Grant, Bennett testified he again met with the same attorney who this time advised him to get a special prosecutor appointed in Navarro County to bring the case before the grand jury a second time. After the attorney explained to him the procedure for appointing a special prosecutor, Bennett testified he had the attorney draft a petition alleging the district attorney had a conflict of interest and accusing him of taking no action in the case.[3] The petition further sought the appointment of Robert Dunn—a local attorney and neighbor of Bennett's—as a special prosecutor for the case. Bennett, who resided and ran a cattle ranch in Navarro County, testified that he then led the effort to circulate and obtain over 250 signatures from Navarro County residents for the petition seeking the appointment of Dunn as special prosecutor for the case. Bennett testified that others helped with the petition but that "it was mostly me . . . I think I done most of it." The district attorney, who was now seeking reelection

---

[3] The petition alleged the district attorney had a conflict of interest in the case because he had previously worked for the district attorney's office in Llano County.

6

in a hotly contested race, testified that he was unaware that Bennett was leading this campaign throughout the county until Bennett showed up at his office for a final meeting. Bennett, with the signed petitions in hand, then accused the district attorney of being partial and unfair when he presented Grant's case to the grand jury and demanded that Dunn be appointed special prosecutor in the case. Feeling that Bennett's petition campaign "wasn't helping" his chances of reelection, the district attorney testified that he agreed to the appointment of Dunn as special prosecutor in the case.[4]

Ultimately, Bennett was successful in his goal of getting Grant indicted, as the special prosecutor presented the case for a second time to the grand jury—more than four years after the phone call between Grant and Bennett occurred—but this time obtained indictments for the felony offenses of tampering with a witness and attempted bribery. The special prosecutor testified that in deciding whether to present the case to the grand jury, he interviewed both Bennett and Rogers but exercised independent discretion in ultimately determining whether there was sufficient evidence to prosecute the case. He testified further that he relied on evidence other than Bennett's and Rogers' statements in his decision to prosecute. When asked, however, whether Bennett's and Rogers' statements were "very material to [his] decision to proceed to the grand jury," the special prosecutor acknowledged that the statements were "definitely" very material to his decision. Further, he acknowledged testifying during his deposition that he "would not have presented" the case to the

---

[4] Later that year, the district attorney lost his reelection. Almost immediately after starting private practice, Bennett came to the former district attorney's office and retained him as counsel for himself and the Bonham Corporation in two separate lawsuits.

7

grand jury if he had believed Bennett "was making untrue statements." He also testified that if he believed there had been a "tailoring of the facts" by Bennett—as the Navarro County district attorney believed—that it would have affected his decision to go to the grand jury.[5] Grant maintained throughout trial that both men had lied to the authorities about the alleged blackmail.

Further, some of the evidence Bennett presented to the special prosecutor appears from the record to have differed from the initial evidence presented to the district attorney. First, there is no evidence in the record that Bennett reported to the special prosecutor two incidents of alleged extortion occurring on different dates—as he had to the district attorney. Rather, the special prosecutor testified only as to the alleged misconduct occurring during phone conversations on October 4, 2011, and the indictment alleged only one count—not two—of the charged offenses. Second, Bennett added a new detail to his allegations, contending for the first time that Grant had specifically asked him to pay $5,000 for the pictures. In a previous written statement to the authorities, Bennett did not allege a specified amount in his extortion claims. The Navarro County district attorney also did not recall Bennett telling him this detail, and it would have been material to how he presented the case to the grand jury because the amount of money at issue increased the degree of the offense.[6] *See* Tex. Penal Code § 31.03(e) (value of property involved in theft dictates classification of offense). Finally, the special prosecutor additionally testified that in deciding to

---

[5] The Navarro County district attorney testified that he had informed the special prosecutor of his belief that there had been some tailoring of the facts by Bennett. The special prosecutor denied this, testifying that "no one had told [him]" of any manipulation of the facts by Bennett.

[6] Interestingly, the district attorney testified that the amount at issue increased the degree of the offense from a misdemeanor to a felony. The statute of limitations for felony theft is five years, rather than the two year statute of limitations for misdemeanor theft. *See* Tex. Code Crim. Proc. arts. 12.01(4)(A), 12.02.

prosecute the case, he relied—in part—on a transcript from Bennett purportedly transcribing secretly-taped "conversations" with Grant that substantiated Bennett's claim that Grant had sought $5,000 from him. If this transcript was also given to the district attorney, he made no reference to it in his testimony.

Regarding the transcript, the special prosecutor testified that initially Bennett presented him with a tape recording of "conversations" but that he was unable to understand it because it was "awful garbled." Bennett then gave him a transcript purportedly transcribing the tape. The special prosecutor could not testify as to when the tape was allegedly recorded, but it appears from his testimony that he believed the tape was a recording of the actual telephone conversations reflected on Grant's telephone bill or conversations related directly to those phone records. He further testified that the taped conversations substantiated Bennett's claim that Grant had specifically sought "$5,000" for the pictures. This transcript, however, was destroyed when Grant's record was later expunged. Besides this information, there is no additional information in the record as to what was reflected in the transcript or the tape. Bennett himself testified at trial that he had secretly recorded a conversation with Grant and had presented this tape to law enforcement, but this tape recorded only a single conversation between Grant and Bennett occurring almost a year *prior* to Grant's alleged extortion. As such, there is no mention on the tape of the photographs or a demand for $5,000. Indeed, when the special prosecutor was presented with a transcript of the tape Bennett testified to presenting to other law enforcement, the special prosecutor testified that he had never seen it before, and it was "completely different" than the transcript Bennett had given him.

Bennett's plan to imprison Grant seemed to finally be coming to fruition when the special prosecutor then took this evidence to a second grand jury and succeeded in obtaining two

9

felony indictments, and Grant surrendered himself to authorities. But Bennett's long and hard-fought quest ended nine months later, when both of Grant's indictments were quashed because the charges had been filed past the statute of limitations. Further, the trial court granted Grant's motion to have his arrest and indictments expunged from his record as void. Upon expunction, Grant—who was already being sued by Bennett for slander—added a counterclaim against Bennett and the Bonham Corporation for malicious criminal prosecution.[7] Upon hearing the preceding evidence, the jury found that Bennett and the Bonham Corporation had indeed maliciously prosecuted Grant. They appeal, contending there is insufficient evidence of a malicious prosecution. Appellants' claim requires us to first expound upon the law of malicious prosecution.

## B.     Malicious Prosecution

Malicious prosecution is an unusual tort in that it requires the court to balance society's interest in protecting private persons who report criminal conduct with the individual citizen's interest in being protected against unjustifiable and oppressive litigation of criminal charges. *Browning-Ferris Indus., Inc. v. Liek*, 881 S.W.2d 288, 290–91 (Tex. 1994). In that regard, the Texas Supreme Court has instructed us that the balance between these important interests is maintained by strictly adhering to the defined elements of an action for malicious prosecution and that even a small departure from the exact prerequisites for liability may threaten this delicate balance. *Id*. But, "as with any other cause of action, if the elements of malicious prosecution are proved, liability is established." *Id*. at 291. Those elements are:  (1) the commencement of a criminal

---

[7] The jury found against Bennett on his slander claim, which Bennett does not appeal.

prosecution against the plaintiff; (2) causation of the action by the defendant; (3) termination of the prosecution in the plaintiff's favor; (4) the plaintiff's innocence; (5) the absence of probable cause for the proceedings; (6) malice in filing the charges; and (7) damages. *Richey v. Brookshire Grocery Co.*, 952 S.W.2d 515, 517 (Tex. 1997).

Appellants do not dispute the jury's findings that there was no probable cause to prosecute Grant, that Grant was innocent of the charges, and that Bennett acted with malice in pursuing the charges. Rather, they argue only that there is legally insufficient evidence that Bennett's conduct caused the commencement of a criminal prosecution against Grant. The causation element of malicious prosecution requires evidence that a defendant "initiated" or "procured" a criminal prosecution. *Lieck*, 881 S.W.2d at 292. A person initiates a criminal prosecution if he makes a formal charge to law enforcement authorities. *Id*. Here, there is no evidence in the record that Bennett filed any formal charges; Grant, therefore, relies on procurement. A person "procures" a criminal prosecution "if his actions are enough to cause the prosecution, and but for his actions the prosecution would not have occurred." *Id*. Thus, procurement requires that a person's actions be both a "necessary and a sufficient cause of the criminal prosecution." *Id*. Appellants argue there is no evidence Bennett "procured" Grant's criminal prosecution because the prosecutors involved acted with independent discretion, and their exercise of discretion was a superceding, intervening cause of the prosecution that destroyed his own liability in bringing about the charges. Appellants are correct that generally a person cannot procure a criminal prosecution when the decision whether to prosecute is left to the discretion of another because the independent exercise of discretion destroys the necessary causal link between the defendant and the prosecution. *See id*. There are,

11

however, two important exceptions to this rule where a defendant may still be liable for malicious prosecution because his actions are such that it makes an intelligent exercise of discretion impossible: (1) when a defendant provides information which he knows is false that causes a criminal prosecution, or (2) when a defendant's conduct was the determining factor in the prosecutor's decision to prosecute. *See id.* at 292–94. We conclude there is legally sufficient evidence to support the jury's finding of causation under both exceptions.

1. **Legally sufficient evidence Bennett procured Grant's prosecutions by providing false information.**

The first exception is when a defendant provides information which he knows is false that causes a criminal prosecution. *See id*. at 293. For this exception, the plaintiff must prove both that the defendant knowingly furnished false information to authorities, and that but for such false information, the prosecutor would not have decided to prosecute. *King v. Graham*, 126 S.W.3d 75, 76 (Tex. 2003). The prosecutor's reliance on the false information makes an intelligent exercise of discretion impossible and establishes the causal link necessary to hold the defendant liable for malicious prosecution. *See id*. at 78. But, if the decision to prosecute would have been made with or without the false information, the defendant did not cause the prosecution by supplying false information. A single prosecution may, however, be procured by more than one person. *Lieck*, 881 S.W.2d at 292.

Appellants challenge only the legal sufficiency of the jury's finding that Bennett procured Grant's prosecution. A party challenging the legal sufficiency of the evidence supporting an adverse finding on an issue for which the opposing party bears the burden of proof will prevail

12

if there is a complete absence of evidence of a vital fact or if the evidence offered to prove a vital fact is no more than a scintilla. *See Waste Mgmt. of Tex., Inc. v. Texas Disposal Sys. Landfill, Inc.,* No. 12-0522-CV, 2014 WL 1875637, at *8 (Tex. May 9, 2014); *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). More than a scintilla exists when the evidence as a whole rises to a level enabling reasonable and fair-minded people to have different conclusions. *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). In conducting a legal-sufficiency review, we consider the evidence in the light most favorable to the judgment, crediting evidence that a reasonable fact finder could have considered favorable and disregarding unfavorable evidence unless the reasonable fact finder could not. *City of Keller*, 168 S.W.3d at 807. We indulge every reasonable inference that supports the jury's findings. *Id.* at 822. Therefore, we must uphold the jury's verdict unless—after viewing the evidence in the light most favorable to the jury's verdict and disregarding contrary evidence unless a reasonable jury could not—there is no more than a scintilla of evidence to support the finding of procurement.

Reviewing the evidence in the light most favorable to the jury's verdict, the Navarro County district attorney believed Bennett's claims were barred by limitations and would never have brought this case before the grand jury but for Bennett changing his story to add an additional claim of extortion occurring within the limitations period. As Grant testified this was a false allegation, we will assume—for purposes of our analysis—that the allegation was false, and there is more than sufficient evidence that the false allegation was the but-for cause of the prosecutor presenting the case to the grand jury. Traditionally, however, the tort of malicious prosecution does not arise until process is issued, an indictment is returned, information filed, or the accused is arrested. *See* Restatement (Second) of Torts § 654 (1977). Here, there is no evidence in the record that any of

these events occurred with regard to this first proceeding before the grand jury or that Grant was aware of or suffered damages from this proceeding. Accordingly, the bulk of our analysis must focus on the second presentment of the case to the grand jury by the special prosecutor, which ultimately resulted in two indictments and Grant's arrest.

Viewing the evidence regarding the second grand jury proceeding in the light most favorable to the verdict, we conclude there was more than a scintilla of evidence to support the jury's finding that Bennett procured the prosecution. The special prosecutor acknowledged in his testimony that Bennett's statements were "definitely . . . very material" to his decision to proceed to the grand jury. He further acknowledged that if he had believed Bennett's statements were untruthful, then he "would not have presented" the case to the grand jury. Assuming Bennett's statements were false, the special prosecutor's testimony provides more than a scintilla of evidence that Bennett was a necessary and sufficient cause of the prosecution. *Compare King*, 126 S.W.3d at 79 (holding insufficient evidence of causation where "[n]othing in the record shows that the false information was material to the decision to prosecute"). Further, there was additional evidence that the special prosecutor relied on the transcript that Bennett had given him allegedly transcribing secretly-taped conversations with Grant. From the record, there was sufficient evidence for the jury to infer that Bennett had fabricated this evidence and that it was a material cause of the prosecution, as the special prosecutor testified that the transcript substantiated Bennett's claim that Grant had sought $5,000 from him.

For legal sufficiency review, we consider the evidence in the light most favorable to the judgment, crediting evidence that a reasonable fact finder could have considered favorable and

14

disregarding unfavorable evidence unless a reasonable fact finder could not. *See City of Keller*, 168 S.W.3d at 827. We note here the special prosecutor testified that—in addition to the information provided by Bennett—he also relied on Grant's sworn testimony from Bennett's prior criminal trial for cattle theft. At that trial, the special prosecutor testified Grant purportedly admitted making a phone call to Rogers seeking money for the pictures but alleged he was only "joking."[8] The special prosecutor testified that in his opinion Grant "tried to cover himself" by alleging that it was a joke, and when asked whether he would have prosecuted based solely on this testimony, he responded: "*I think so*, because the fact is that he admitted making the calls." (emphasis added). When a prosecutor relies on evidence independent of the false information provided by the defendant, the defendant "cannot be said to have caused the prosecution if the [false] information was immaterial to the decision to prosecute." *King*, 126 S.W.3d at 78. The special prosecutor, however, had previously acknowledged that Bennett's evidence was definitely very material to his decision to prosecute and that he would not have presented the case if he had thought Bennett was providing false information.[9]

---

[8] The transcript from Grant's sworn testimony is not in the record. Grant advanced the same theory of innocence at this trial. For purposes of the malicious prosecution claim, the jury found Grant innocent of Bennett's allegations.

[9] The special prosecutor also testified that he relied on Rogers' statement that Grant had telephoned him and acknowledged attempting to sell the photos to Bennett. At trial, Bennett testified that Rogers "was in on the efforts to get [Grant] charged." Rogers is described in the record as Bennett's best friend and an employee of the Bonham Corporation. At trial, Grant denied Rogers' accusations, and the jury was free to disbelieve his testimony. The Texas Supreme Court has instructed that "[j]ust as there may be more than one proximate cause of an event, a single prosecution may be procured by more than one person." *Browning-Ferris Indus., Inc. v. Lieck*, 881 S.W.2d 288, 292 (Tex. 1994). The fact that Rogers may also be liable for procuring Grant's prosecution does not negate Bennett's own liability.

15

To the extent there is any conflict in the special prosecutor's testimony as to the cause of the prosecution, causation is generally a question of fact for the jury, *see Rodriguez v. Moerbe*, 963 S.W.2d 808, 818–19 (Tex. App.—San Antonio 1998, pet. denied), and there is more than a scintilla of evidence to support the jury's fact finding that Bennett's false information was a necessary and sufficient cause of the prosecution. Further, the jury was entitled to resolve any conflicts in the special prosecutor's testimony and could choose to believe or disbelieve all or part of his testimony. *See McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986) (jury may "resolve inconsistencies in the testimony of any witness"); *see also City of Keller*, 168 S.W.3d at 819 ("Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony. . . . Reviewing courts cannot impose their own opinions to the contrary."). Consequently, we conclude a reasonable jury could find that the false information provided by Bennett was a necessary and sufficient cause of Grant's prosecution and disregard any contrary evidence. After reviewing the evidence under the appropriate standard, we conclude there is legally sufficient evidence to support the jury's finding that Bennett procured Grant's criminal prosecution by providing false information.

### 2. Legally sufficient evidence Bennett procured Grant's prosecution by other improper conduct.

The second exception in which a defendant may be liable for malicious prosecution is "when his conduct is the determining factor in the prosecutor's decision to prosecute."[10] *See*

---

[10] Appellants contend this is not a recognized exception under Texas law. We disagree. In accordance with the Restatement of Torts, the Texas Supreme Court has stated that a defendant may procure a prosecution "not only when he gives information he knows is false to a prosecutor, but also when his conduct is the determining factor in the prosecutor's decision to prosecute." *Browning-Ferris Indus., Inc. v. Lieck*, 881 S.W.2d 288, 294 (Tex. 1994) (citing Restatement (Second) of Torts

16

*Lieck*, 881 S.W.2d at 294. For this exception to be applicable, it must "appear that [the defendant's] desire to have the proceedings initiated, expressed by direction, request or pressure of any kind, was the determining factor in the official's decision to commence the prosecution." *Id*. (quoting Restatement (Second) Torts § 653 (1977)). The Texas Supreme Court in 1994 adopted this exception set out in the Restatement of Torts. *See id*. We note, however, that the parties have not cited to, and we have not found, any Texas case that has determined what type of conduct would constitute "procurement" under this exception. *See* Michol O'Connor, O'Connor's Texas Causes of Action, ch. 19-A, at 572 (2014) ("No Texas court has determined what type of conduct, other than providing false information, would constitute procurement."). After careful review of the record in this case, we conclude this is the rare case where the defendant engaged in such an intentional and systematic abuse of the justice system that there was sufficient evidence his conduct was the determining factor in the prosecution.

As there are no examples under Texas case law, we will draw upon the Restatement itself for guidance. The Restatement provides the following example as illustration of this exception:

> A goes to B, a district attorney and informs him that C has committed a battery upon A. A is a political boss to whom B owes his election. A demands that B prosecute C. The battery is one that has created no public disturbance and is therefore an offense for which a public prosecutor would not ordinarily institute proceedings. In compliance with A's demand, B files an information against C. A has procured the institution of the proceeding.

§ 653 (1977)); *see also Turner v. Roadway Express, Inc*., 911 S.W.2d 224, 226 (Tex. App.—Fort Worth 1995, writ denied) (recognizing Texas Supreme Court's holding in *Lieck* that malicious prosecution may occur when either a person gives false information to authorities or when a person's conduct was determining factor in decision to prosecute).

17

Restatement (Second) Torts § 653 (1977). In the example, the defendant procured the prosecution by exerting improper pressure on the district attorney to bring charges that ordinarily would not have been filed. Similarly, in this case, there is legally sufficient evidence in the record that Grant would not have been prosecuted but for Bennett's acknowledged and systematic campaign to improperly influence the proceedings. First, the Navarro County district attorney testified emphatically that although he had the authority to file an information charging Grant with misdemeanor attempted theft, he "dug in his heels" and steadfastly refused to press charges against Grant because of the statute of limitations and because he believed Bennett had been tailoring the facts to create a chargeable offense. Only after immense pressure from Bennett and some altering of the facts, did the district attorney finally yield and agree to bring the misdemeanor case before the grand jury. He testified, however, that ordinarily he would not have presented this misdemeanor case to the grand jury but only did so because of Bennett's unceasing demands. Like the example in the Restatement, this proceeding before the grand jury would never have occurred but for Bennett exerting such pressure on the district attorney that his desire to have the proceeding commenced was the determining factor in the district attorney's decision to prosecute.

After the grand jury refused to indict, Bennett—undeterred in his goal of having Grant imprisoned—then organized and led an extraordinary petition campaign to put in place a hand-picked special prosecutor to indict Grant. At a time when the district attorney was facing a heavily-contested election, Bennett then came to the district attorney's office with the petitions demanding the appointment of his special prosecutor to the case. Feeling Bennett's petition campaign "wasn't helping" his chances of reelection, the district attorney again yielded to Bennett's demands. Here, like the example in the Restatement, Grant's second prosecution was a proceeding that would

18

have never occurred but for Bennett's exertion of untoward pressure on the district attorney. Undoubtedly, there is more than a scintilla of evidence that Bennett's acknowledged and systematic campaign to improperly influence judicial proceedings was the determining factor in the prosecution.

Accordingly, we conclude there is legally sufficient evidence that Bennett procured Grant's prosecution by either providing false information to authorities or by engaging in such a systematic and untoward campaign to influence judicial proceedings that his conduct was the determining factor in the prosecution.

## CORPORATE LIABILITY

Having found sufficient evidence of Bennett's liability in this suit, we next address Bonham's liability. With regard to Bonham, the jury made several alternate findings imputing corporate liability on Bonham for the malicious prosecution. First, under the malicious prosecution question, the jury found that both Bennett and Bonham—through an agent—had maliciously prosecuted Grant. Second, the jury found that Bennett was acting in his capacity as a vice-principal of Bonham when he maliciously prosecuted Grant. Finally, the jury found that Bonham was responsible for Bennett's conduct under a "reverse-piercing" theory of liability. In two individual issues, Bonham contests its liability, arguing: (1) that it was improperly joined as a party to the suit and (2) there is no evidence to support the jury's findings of corporate liability.

### A.    Joinder

In its first individual issue, Bonham contends that it was improperly joined as a party to this suit. A trial court is given a great deal of discretion in matters of joinder, and its decision on

19

such procedural issues will not be disturbed on appeal absent an abuse of discretion. *Varme v. Gordon*, 881 S.W.2d 877, 882 (Tex. App.—Houston [14th Dist.] 1994, writ denied). A trial court abuses its discretion when it has acted in an unreasonable or arbitrary manner, or when it acts without reference to any guiding principle. *Coburn v. Moreland*, 433 S.W.3d 809, 823 (Tex. App.—Austin 2014, no pet.). A trial court's decision on the matter of the joinder of an additional party is "generally based on practical considerations with a view to fair, orderly and timely prosecution and disposal of pending litigation." *Fireman's Fund Ins. Co. v. McDaniel*, 327 S.W.2d 358, 373 (Tex. Civ. App.—Beaumont 1959, no writ).

Bonham's misjoinder claim necessitates a brief review of this case's procedural history. This suit was originally initiated by Bennett—the plaintiff in this suit—filing an original petition suing Grant for slander. In his original answer, Grant asserted a counterclaim against Bennett for intentional infliction of emotional distress. Later, in an amended pleading, Grant added Bonham as an additional counter-defendant to his intentional infliction of emotional distress claim. Upon request of the trial court, Grant then filed a motion seeking leave to include Bonham in the suit. Grant's motion for leave sought to add Bonham as a party to the suit on the grounds that Bonham was Bennett's alter ego, and his claims of intentional infliction of emotional distress against both Bennett and Bonham "arose from the same transaction, occurrence, or series of transactions or occurrences . . . and the questions of law and fact in this case are common to both [Bennett and Bonham]." After a hearing, the trial court granted the motion without stating the grounds for the joinder and ordered Grant to serve Bonham with process. After being served, Bonham answered as a party to the suit without further objection. Later, after Bonham had entered an

appearance in the suit, Grant again amended his pleadings to add—after his indictments were expunged—an additional counterclaim against Bennett and Bonham for malicious prosecution. Bonham answered the malicious prosecution claim without objection.

On appeal, however, Bonham contends it was improperly joined in the lawsuit under Texas Rule of Civil Procedure 38. *See* Tex. R. Civ. P. 38. Rule 38 provides that a defendant may bring in a third party to a suit if that person is or may be liable to him or the plaintiff for all or part of the plaintiff's claim against him. *Id.* A third-party action under Rule 38 is not an independent cause of action but is derivative of the plaintiff's claim. *Id.*; *see In re Seven-O Corp.*, 289 S.W.3d 384, 390 (Tex. App.—Waco 2009, orig. proceeding [mand. denied]). Here, we agree with Bonham that Grant's claim asserting an independent cause of action against it for intentional infliction of emotional distress was not a third-party claim as contemplated by Rule 38. Grant did not assert—as Rule 38 requires—that Bonham was liable for all or part of Bennett's slander claim against him. Rather, Grant sought to join Bonham as an additional party to his counterclaim seeking affirmative relief for intentional infliction of emotional distress.

We cannot, however, conclude that Bonham has proven the trial court abused its discretion by allowing the joinder because our rules of civil procedure otherwise permit the joinder of a non-party to a previously filed counterclaim. Texas Rule of Civil Procedure 97 provides that additional persons—other than those made parties to the original action—may be made parties to a counterclaim in accordance with the provisions of Rule 39 ("Joinder of Persons Needed for Just Adjudication") and Rule 40 ("Permissive Joinder of Parties"). *See* Tex. R. Civ. P. 39, 40, 97(f); *see also* Tex. R. Civ. P. 37 ("Before a case is called to trial, additional parties necessary or proper

21

parties to the suit, may be brought in, either by the plaintiff or the defendant upon such terms as the court may prescribe."). Thus, non-parties must be joined as additional defendants to a counterclaim if in their absence complete relief cannot be afforded among the parties. *See* Tex. R. Civ. P. 39, 97(f). In addition, the trial court has the discretion to permit the joinder of additional defendants to a counterclaim under the permissive joinder provisions of Rule 40. *See* Tex. R. Civ. P. 40 ("All persons may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all of them will arise in the action"), 97(f) (persons other than those made parties to the original action may be made parties to a counterclaim in accordance with the provisions of Rule 40).[11]

Further, we note that once Bonham entered an appearance in this suit, Grant was entitled to assert his additional counterclaim against Bonham for malicious prosecution without further service of process. *See* Tex. R. Civ. P. 97(b), 124. Under these circumstances, we cannot conclude—nor has Bonham proven—that the trial court abused its discretion by permitting the joinder. *See Varme*, 881 S.W.2d at 883 ("We emphasize that the trial court is given great discretion over joinder questions."). Accordingly, we overrule Bonham's joinder arguments.[12]

---

[11] On rehearing, the Appellants contend they had no notice that Grant was seeking to join Bonham under permissive venue. Grant's motion for leave sought to add Bonham as a party to his counterclaim and tracked the language of the permissive joinder rule. *See* Tex. R. Civ. P. 40.

[12] Bonham hints in its brief that "Grant's claims against the Corporation were thinly veiled—yet ultimately successful—efforts to avoid limitations." The statute of limitations issue was not submitted in the jury charge, and Bonham does not assert in an issue on appeal that the evidence conclusively proves Grant's claims were barred by limitations. Nor does Bonham appeal any ruling it sought with sufficient specificity to make the trial court aware of its limitations complaint. We need not address the merits of the limitations issue.

22

**B.     Corporate Liability**

In its second individual issue, Bonham contends there is no evidence to support the jury's finding of corporate liability. Corporations can act only through human agents, and when "actions are taken by a vice-principal of a corporation, those acts may be deemed to be the acts of the corporation itself." *See GTE Sw., Inc. v. Bruce*, 998 S.W.2d 605, 618 (Tex. 1999); *see also Qwest Int'l Commc'ns, Inc. v. AT&T Corp.*, 167 S.W.3d 324, 326 (Tex. 2005) (corporation is liable for exemplary damages if it acts with malice through the actions of a vice-principal). A corporation, however, cannot be liable for damages "if the vice-principal's misconduct occurred while he was acting in a personal capacity unrelated to his authority as a corporate vice-principal." *Bennett I*, 315 S.W.3d at 884. A vice-principal of a corporation is a person who "represents the corporation in its corporate capacity, and includes persons who have authority to employ, direct, and discharge servants of the master, and those to whom a master has confided the management of the whole or a division of his business." *Id*. at 883.

Regarding Bennett's relationship with Bonham, the Texas Supreme Court in *Bennett I* concluded that Bennett was "indisputably a vice-principal of the Bonham Corporation, he was most likely the only vice-principal and the only person whose conduct and decisions could subject the corporation to exemplary damages." *Id.* at 884. In this case, similar evidence was presented that, although Bonham was putatively owned by Bennett's daughters, the daughters had no control over the corporation and received no profits, and Bennett himself exclusively controlled and profited from Bonham. Bennett testified that he did not own a home or a vehicle and did not have a bank account but lived rent-free in a home owned by Bonham, drove Bonham vehicles, and "did whatever [he]

23

wanted to with the corporation bank account." On this record, Bonham concedes that Bennett was indisputably a vice-principal of Bonham. Instead, Bonham argues only that there is insufficient evidence to support the jury's finding that Bennett was acting in his capacity as a vice-principal of Bonham when he maliciously prosecuted Grant.

In its brief, Bonham attempts to distinguish this case from *Bennett I*, in which the Texas Supreme Court found there was "ample evidence" that Bennett was acting in his corporate capacity when he converted Reynolds' cattle using "corporate authority over corporate employees, on corporate land, [and] using corporate equipment." *Id*. at 885. Bonham argues in its brief that in contrast to *Bennett I*, "the instant case does not involve the use of corporate property or the exercise of corporate privileges to accomplish the underlying tort." We conclude, however, that in this case there is, again, more than ample evidence to impart corporate liability on Bonham.

Reviewing the record, Bennett's malicious prosecution of Grant involved several courses of conduct that implicate Bonham. First, Bennett contacted an attorney who had an ongoing attorney-client relationship with Bonham and directed him to research whether Grant's alleged actions constituted a criminal offense. The attorney then drafted a brief based on his legal research advocating that Grant be charged with attempted theft. The brief was sent to the Navarro district attorney and described as a "catalyst" in the district attorney's decision to bring the case before a grand jury. This same attorney was also pivotal in later advising Bennett to seek the appointment of a special prosecutor to the case and then drafted the petition accusing the Navarro County district attorney of bias. The attorney testified at trial that he had an ongoing attorney-client relationship

24

with Bonham since 1982. When asked whether he had ever done any personal work for Bennett, the attorney answered: "I don't remember ever doing anything for Mr. Bennett except a will one time."

Bennett's malicious prosecution of Grant was further accomplished by traveling many miles in a Bonham vehicle to meet with officials in four different counties to have Grant prosecuted. Bennett testified at trial that he did not own a vehicle and acknowledged that he used Bonham vehicles to accomplish this phase of the malicious prosecution. When asked whether he ever used Bonham's vehicles for personal use, Bennett responded "I don't have much personal business." Bennett's lack of personal business was further exemplified when he testified that he directed a Bonham employee to type a transcript of his alleged secretly-taped conversation with Grant. He then testified that he presented this typed transcript to law enforcement in his attempts to prosecute Grant. The employee who typed the transcript served as Bonham's corporate representative at trial."[13]

Viewing the foregoing evidence in the light most favorable to the jury's verdict, we conclude there is more than a scintilla of evidence to support the jury's finding that Bennett was acting in his capacity as a vice-principal of Bonham when he maliciously prosecuted Grant.[14] We overrule Bonham's individual issues on appeal.

---

[13] We also note that the Navarro County district attorney testified that he had formed the impression that Bennett was attempting to prosecute Grant in order to influence civil litigation arising from this case. The jury further heard testimony that Grant was the "star witness" in the Reynolds' civil suit against *both* Bonham and Bennett, which eventually resulted in a $1 million punitive damages award against Bonham.

[14] The jury alternatively found that Bonham was liable for Bennett's malicious prosecution of Grant based on agency and reverse-piercing theories. We do not address Bonham's challenges to these findings, as we have already concluded there was sufficient evidence to impart corporate liability on Bonham as a vice-principal.

**DAMAGES**

After finding Bennett and the Bonham Corporation maliciously prosecuted Grant, the jury found Grant was entitled to the following damages: $5,000 in mental anguish damages; $60,000 in attorneys' fees incurred defending the malicious prosecution; $1 million in punitive damages awarded against Bennett; and another $1 million in punitive damages awarded against the Bonham Corporation. The trial court's final judgment reduced the award of compensatory damages to $10,703 but awarded Grant, in accordance with the jury's verdict, $2 million in punitive damages. Appellants challenge the entire award. We will begin by reviewing the compensatory damages awarded to Grant, which are comprised of $5,000 for mental anguish damages and $5,703 in attorneys' fees.

**A.      Mental Anguish**

Appellants first contend there is no evidence to support the trial court's award of $5,000 in mental anguish damages. Although Grant was indicted and arrested as a result of their malicious prosecution, Appellants challenge the mental anguish damages contending there is insufficient evidence Grant suffered the "high degree of mental pain and distress necessary for compensable mental anguish." To support an award of mental anguish damages, there must be both evidence of the existence of compensable mental anguish damages and evidence to justify the amount awarded. *Hancock v. Variyam*, 400 S.W.3d 59, 68 (Tex. 2013). Mental anguish is only compensable if it causes a "substantial disruption in daily routine" or "a high degree of mental pain and distress." *Id.*; *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995).

26

Regarding Grant's mental anguish damages, Grant testified that—long before his indictment—he "knew Bennett would come after [him]" for turning his photos over to the authorities. Fearful "for [his] life and [his] family," Grant testified he moved four times in an effort to keep his family safe from Bennett. Each time he would move, however, Grant testified that Bennett would show up at depositions with his tape recorder and pencil in hand to record Grant's new address. At one such deposition taken prior to his indictment, Grant testified that he heard Bennett avow that "he would see me go to the penitentiary." He further testified that he was aware of other instances when Bennett "had seen that people went to prison" and believed Bennett was "fully capable of seeing that [he] went to prison." After hearing Bennett's testimony that it was his goal to put him in prison, Grant testified he was fearful to leave home and would lock himself in his house to protect his family. When Grant was finally indicted, his lawyer informed him he had been charged with a felony and was facing prison time. Grant and his mother then drove the three and half hours from Coleman, Texas, where he lived, to Corsicana, Texas, where he had been indicted. Grant surrendered himself to the authorities in Corsicana and was released that day on a surety bond posted by his mother. For the next nine months, the charges remained pending against Grant. Grant testified that he worried how his family would be taken care of if he went to prison and that he was afraid to leave his family alone. He further testified that as a result of worrying about what Bennett was going to do, "I would have bad headaches, weak stomach, couldn't eat, couldn't sleep." Grant additionally testified that the experience affected his mental state as he went from being "a happy-go-lucky" person to feeling like a "completely different person" who struggled with self-esteem and distanced himself from friends and family. Grant's sister confirmed that she noticed a change in Grant's demeanor, testifying that her brother "just closed himself and sequestered himself from everyone."

27

Based on the foregoing, we conclude there is sufficient evidence to support the jury's finding that Grant suffered the degree of mental pain and distress that will support an award of mental anguish damages and that the award of $5,000 was well within the range supported by the evidence.

**B.     Attorneys' Fees**

When a defendant has caused attorneys' fees to be incurred in defense of a criminal charge which was maliciously prosecuted, attorneys' fees in defending the prior criminal charge are recoverable in the malicious prosecution suit as damages. *See IBP, Inc. v. Klumpe*, 101 S.W.3d 461, 478 (Tex. App.—Amarillo 2001, pet. denied). Here, Grant was charged with two felonies: attempted bribery and tampering with a witness. In his pleadings and at trial, however, Grant sued for malicious prosecution based on the attempted bribery charge only. With regard to recovering attorneys' fees for the malicious prosecution as damages, Grant's attorney testified at trial that Grant incurred $6,003.19 in attorneys' fees for defending against *both* charges, but that 95% of the work—or $5,703—would have been necessary for defending the attempted bribery charge alone. The jury, however, found Grant incurred $60,000 in reasonable and necessary attorneys' fees defending against the malicious prosecution. The trial court, in accordance with Grant's voluntary remittitur, reduced this amount to $5,703 to conform to the evidence at trial. Appellants nevertheless contend there is insufficient evidence to support the amount of attorneys' fees awarded as damages.

Appellants do not challenge the reasonableness of the fees. Rather, they argue only that a "reasonable fact-finder could not have . . . allocated 95 percent of the fees incurred on both charges solely to attempted bribery." We disagree. Submitting to the jury an attorney's testimony concerning the percentage of hours relating to specific claims—even a percentage a high as 95%—is

28

sufficient to satisfy a party's burden to segregate its attorneys' fees. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 314 (Tex. 2006) ("an opinion would have sufficed stating that, for example, 95 percent of their drafting time would have been necessary even if there had been no [non-recoverable] claim"). Further, to the extent attorneys' fees "would have been incurred on a recoverable claim alone, they are not disallowed simply because they do double service" with a non-recoverable claim. *See id*. at 313. Grant's indictments were based on the same facts and he asserted the same defense of limitations to both charges. His attorney testified that the legal work performed for both charges was essentially the same, as he drafted the same motions, conducted the same discovery, and attended the same hearings and meetings for both charges. As such, the attorney testified "that 95% of the work that was required on those two charges would've been necessary on just the attempted bribery charge itself alone. . . . I would have done the same work on the attempted bribery charge even if there hadn't been the attempted tampering with a witness charge." As there was sufficient evidence that Grant would have incurred $5,703 in attorneys' fees on the bribery charge alone, we conclude there is sufficient evidence to support the damages award. Finding sufficient evidence to support the award of actual damages, we overrule Appellants' second issue on appeal.

## C.    Exemplary Damages Cap

The Texas Civil Practice and Remedies Code limits the maximum amount of exemplary damages a trial court can award. *See* Tex. Civ. Prac. & Rem. Code § 41.008(b). The cap, however, does not apply when a plaintiff seeks recovery of exemplary damages based on certain felony criminal conduct enumerated under the statute, i.e., cap-busting conduct. *Id*. § 41.008(c).

One such felony cap-busting exception—defined under Penal Code § 32.46—is when a person, with the intent to defraud or harm any person, by deception causes another to sign or execute any document affecting the pecuniary interest of any person in the amount of $1,500 or more. *Id*. § 41.008(c)(11); *see also* Tex. Penal Code § 32.46. Here, the jury made a cap-busting finding that the Appellants, with the intent to harm Grant, caused another by deception to sign or execute his criminal indictment for attempted bribery, and the indictment affected Grant's pecuniary interest in the amount of $1,500 or more. Appellants contend there is legally insufficient evidence to support this finding because: (1) an indictment is not a document affecting the pecuniary interest of any person; and (2) there is no evidence Bennett caused anyone to sign the indictment.

### 1. Document Affecting Pecuniary Interest

Appellants first contend that indictments—as a matter of law—are not documents that affect a defendant's pecuniary interest, and therefore Grant cannot qualify for the cap-busting exception. We are not persuaded by Appellants' argument. The term "pecuniary interest" is not defined by the statute; therefore, courts have defined the term using its common meaning of having a "financial stake" in a matter. *See Briones v. State*, 76 S.W.3d 591, 595 (Tex. App.—Corpus Christi 2002, no pet.); *Goldstein v. State*, 803 S.W.2d 777, 791 (Tex. App.—Dallas 1991, pet. ref'd). Therefore, the narrow question presented is whether there is legally sufficient evidence of Grant having a financial stake in the grand jury's indictment.

Appellants contend that Grant had no financial stake because indictments as a whole are excluded from the class of documents that affect pecuniary interests because—unlike a "bank draft, a promissory note, [or] a deed"—no monetary interest "flow[s] directly from the document."

30

The statute, however, does not require the complainant to have a pecuniary interest in the document itself. *See Lewis v. State*, No. 05-09-00299-CR, 2010 WL 4400515, at *4 (Tex. App.—Dallas Nov. 8, 2010, pet. ref'd) (not designated for publication). Rather, it requires only that the execution of the document *affect* the pecuniary interest of any person. *See* Tex. Penal Code § 32.46. Further, a complainant is not required under the statute to prove actual pecuniary loss. *See Smith v. State*, 681 S.W.2d 71, 75–76 (Tex. App.—Houston [14th Dist.] 1983), *aff'd*, 722 S.W.2d 408 (Tex. Crim. App. 1986) (offense complete when person causes another to execute document with intent to defraud or harm; there is no requirement to prove resulting harm). Therefore, when a person purposely uses deception to cause a court official to execute a document, the executed document may affect pecuniary interests if it subjects a person to potential financial liability. *See Fisher v. State*, 803 S.W.2d 828, 830 (Tex. App.—Dallas 1991, pet. ref'd) (securing issuance of citation through deception affected pecuniary interests as citation made defendant in suit potentially liable for monetary damages); *Woodley v. State*, No. 08-00-00470-CR, 2003 WL 550298, at *6 (Tex. App.—El Paso 2003, pet. ref'd) (mem. op.) (securing trial court's execution of agreed judgment that had been altered to add new defendant and increase amount of award affected pecuniary interests as defendants faced potential liability under altered judgment).

Viewing the evidence in the light most favorable to the jury's finding, we conclude there is more than a scintilla of evidence that Grant's pecuniary or financial interests were affected by the indictment, which—on its face—required him to find a means to post a $10,000 bond or face immediate and indefinite imprisonment. He then was required to obtain legal counsel to quash the indictment, incurring an additional $5,703 in attorneys' fees. Further, if convicted of the offense of

attempted bribery, Grant faced further potential liability as the offense carried a monetary penalty of up to $10,000. *See* Tex. Penal Code §§ 12.34; 15.01; 36.02. Thus, we conclude there is legally sufficient evidence Grant had a financial stake in the indictment, as the execution of the document caused him both immediate financial liability and potential financial liability in the future.

### 2. Causation

Appellants next contend that Bennett cannot be the legal cause of Grant's indictment because (1) the causal link between Bennett's actions and the indictment is too attenuated to satisfy causation requirements under the Penal Code; and (2) it is impossible to prove causation because "grand jury proceedings are secret, so there is no way of knowing which evidence persuaded the grand jury to indict." Criminal liability is predicated on but-for causation but also requires consideration of the foreseeability of the injurious consequences of the defendant's conduct. *Williams v. State*, 235 S.W.3d 742, 764–65 (Tex. Crim. App. 2007). Appellants, relying on the Texas Court of Criminal Appeals' discussion of causation in *Williams v. State*, argue the chain of causation linking Bennett to the indictment is too attenuated to impose criminal responsibility. In *Williams*, the Court found that a mother who left her two daughters in a room with a lit candle under another adult's supervision was not criminally responsible for the children's burning deaths because it was not reasonably foreseeable: (1) that the other adult would forget to blow the candle out before falling asleep; (2) that a sheet or clothing would then fall on the burning candle; and (3) that the other adult would not be able to get children out of the house after the fire started. *Id.* In this excerpt from their brief, Appellants argue the following is the but-for causal chain linking Bennett to Grant's indictment in this case:

- *If* Bennett had not asked for a special prosecutor, and

- *If* Bennett had not given the prosecutor the facts he had gathered, and

- *If* the prosecutor had not brought the case to the grand jury, and possibly,

- *If* the prosecutor had not presented those facts, and, possibly,

- *If* the grand jury had not relied on those facts, and

- *If* the prosecutor had not recommended an indictment or the grand jury had not disregarded the prosecutor's recommendation, and

- *If* at least nine of the grand jurors had not voted to issue the indictment,

- Then Grant never would have been indicted.

Appellants then argue this causal chain is similar to *Williams* because it "is too disconnected from the putative cause to support any finding" of causation. What Appellants fail to account for, however, is that the Court in *Williams* found that causal link insufficient because the events leading to the children's deaths were "*not reasonably foreseeable*." *Id*. at 765 (emphasis added). The facts of this case are much different. The evidence in this case reflects that Bennett set out on a course of conduct to have Grant indicted and was successful in that endeavor. Indeed, Appellants do not contest the jury's finding that Bennett intended to harm Grant by causing the grand jury to sign his indictment. It is reasonably foreseeable that if Bennett intended to put Grant in prison, then provided evidence that a reasonable juror could infer was fabricated or manipulated, and then led a campaign to have a special prosecutor appointed in the case—all of which is more than adequately supported by the record—the end result of these efforts would be Grant's indictment. It is abundantly apparent that Grant's indictment was the natural, probable and foreseeable consequence of Bennett's actions.

33

Appellants next contend that "Grant could not have sustained his burden to prove causation because it is impossible to show that Bennett's conduct was necessary for the indictment to issue [given that] grand jury proceedings are secret." First, as we have already discussed, there was sufficient evidence that but for Bennett's aggressive and untoward efforts to improperly influence the criminal justice system, the case would have never been put before the grand jury, not once, but twice. Further, Bennett does not dispute the jury's finding that he used deception to cause the grand jury to execute the indictment. Deception is defined, as "creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe is true." Tex. Penal Code §§ 31.01(1)(A), 32.46(d)(1). Here, the special prosecutor testified candidly that he had the following evidence from Bennett—at the time he presented the indictments—from which the jury found Bennett used deception to create a false impression that was likely to affect the judgment of another: Bennett's statements that Grant had called trying to sell him incriminating photos for $5,000 and a transcript from Bennett—which the jury could have found was fraudulent—purportedly transcribing a secretly-taped conversation with Grant that substantiated Bennett's claim that Grant had sought $5,000 for the photos. The record further reflects that Bennett testified at the grand jury proceeding but that Grant was not present. In exact accordance with Bennett's evidence, the grand jury's indictment charges that Grant "with the specific intent to commit the offense of bribery, called [Bennett], with the purpose of soliciting a bribe of $5,000."

Under the Penal Code, "a person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause,

34

unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient." Tex. Penal Code § 6.04. Here, Appellants do not challenge the jury's finding that Bennett used deception to indict Grant, and the allegations in the indictment identically mirror the evidence provided by Bennett. Under this record, viewed in the light most favorable to the jury's finding of causation, there is more than a scintilla of evidence in the record that Bennett's conduct *alone* was sufficient to have caused the indictment and to incur criminal responsibility. *See id*. Having found sufficient evidence to support the jury's cap-busting finding, we overrule Appellants' third issue on appeal.

## D. Constitutionality of Exemplary Damages

Appellants lastly attack the award of exemplary damages, contending the dual $1 million exemplary damages awards against Bennett and the Bonham Corporation violate their federal substantive due process rights. While state law governs the amount properly awarded as exemplary damages, that amount is also subject to an ultimate federal constitutional check for exorbitancy. *Tony Gullo Motors I,* 212 S.W.3d at 307. This is because the Due Process Clause of the Fourteenth Amendment prohibits a state from imposing a "grossly excessive" punishment on a tortfeasor. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 562 (1996). But punitive damages "may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition," and "States necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases and in any particular case." *Id*. at 568. "Only when an award can be categorized as grossly excessive in relation to these interests does it enter the zone of arbitrariness that violates" due process. *Id*.

35

In this case, the State has a legitimate interest in both punishing individuals who purposely manipulate the legal system to imprison innocent persons and in deterring its repetition. We must therefore determine whether the punitive damages award in this case was grossly excessive in relation to these interests. *See id.* In determining whether an award is excessive, the United States Supreme Court has identified three "guideposts" by which we must assess the constitutionality of the punitive damages award:

1.  the degree of reprehensibility of the defendant's misconduct;

2.  the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and

3.  the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003); *see also Bennett I*, 315 S.W.3d at 873. Whether a punitive damages award passes constitutional muster under this standard is a question of law that we review de novo. *Bunton v. Bentley*, 153 S.W.3d 50, 54 (Tex. 2004).

### 1.     Reprehensibility of Bennett's Misconduct

The first guidepost, the degree of reprehensibility of the defendant's misconduct, focuses on the "enormity" of the misconduct and is "the most important indicium of the reasonableness of a punitive damages award." *BMW of N. Am.*, 517 U.S. at 575. Punitive damages are not compensation for injury; rather, they operate as private fines intended to punish the defendant and to deter future wrongdoing. *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 432 (2001). Exemplary damages should therefore reflect the "enormity of [the] offense." *BMW of N. Am.*,

36

517 U.S. at 575. In evaluating the enormity of a person's misconduct, we consider five nonexclusive factors— whether:

1.      The harm inflicted was physical rather than economic;

2.      The tortious conduct showed an indifference to or reckless disregard for the health or safety of others;

3.      The target of the conduct had financial vulnerability;

4.      The conduct involved repeated actions, not just an isolated incident; and

5.      The harm resulted from intentional malice, trickery, or deceit, as opposed to mere accident.

*State Farm Mut. Auto. Ins.*, 538 U.S. at 419. One of these reprehensibility factors alone "may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." *Id*.

     **a.**     ***Harm resulted from intentional malice, trickery or deceit.***

Appellants concede there is evidence that Grant's indictment resulted from "intentional malice, trickery, or deceit" but argue that none of the other factors weigh in favor of punitive damages. We certainly agree with Appellants that the fifth reprehensibility factor weighs in favor of punitive damages. The jury heard evidence that Bennett's goal was to put Grant in prison to settle a personal vendetta and to influence pending civil litigation, and that he set out on a campaign of legal thuggery—including allegations of lying, tailoring evidence, and even outright fabrication of evidence—to ensure that Grant was imprisoned. When Bennett could not win at this game, the

37

record reflects he decided to change the playing field by exerting political pressure on a district attorney to appoint his own hand-picked special prosecutor to the case.

Further, when considering exemplary damages, we may examine Bennett's misconduct beyond the malicious prosecution itself when it "demonstrates the deliberateness and culpability" of his actions and bears "a nexus to the specific harm suffered" by Grant. *Bennett I*, 315 S.W.3d at 875. Here, Bennett's efforts to manipulate the legal system to imprison Grant were part of a larger escapade designed to thwart justice and abuse the court system. We conclude the following allegations of malfeasance may properly inform the reprehensibility analysis, as they demonstrate the deliberateness, culpability, and motive behind Bennett's actions and relate back to the underlying malicious prosecution:

*Urging Grant to Lie and Attempting to Bribe Him.* Grant testified that, prior to turning his photos over to the authorities, Bennett visited his home and urged him to lie about what he had seen. Grant's sister testified that Bennett then attempted to offer Grant a lucrative job under the guise of helping his family after a car accident. She testified Bennett offered that if Grant "can come and help him for a couple of days, he had a job that he can get $4,000 for . . . a couple of days of work." When Grant had worked for Bennett the previous year, his salary was $1,100 a month. At the time Bennett offered this money, Grant was posed to be the star witness testifying against Bennett in his criminal trial for cattle theft and in Reynolds' civil suit.

*Threatening Grant.* When money was not enough to persuade Grant, there was evidence at trial that Bennett then tried a new tactic to silence Grant. Grant's sister testified that Bennett called her more than 15 times trying to obtain Grant's new contact information. Frustrated that Bennett would not stop calling, the sister provided Bennett with her husband's cell phone number and said it was Grant's number. Bennett testified that he then asked Rogers to call the number. Shortly thereafter, Rogers called the number and reached Grant's brother-in-law. Believing he was speaking to Grant, Rogers then—according to the brother-in-law—demanded that Grant turn over the pictures and threatened "if he didn't get the pictures, that he had a jake-leg lawyer that would obtain them" and "that he was going to take care of [Grant] one way or the other." The brother-in-law testified that he relayed these threats to Grant.

*Litigation Against Grant.* Being unsuccessful in silencing Grant, Bennett then filed this suit alleging Grant had slandered him by saying that he had stolen Reynolds' cattle and sought $50,000

38

in damages. The jury found against Bennett on his slander claim, finding that Grant's statement that Bennett had stolen from Reynolds was substantially true. In addition to this suit, Bennett filed—the day after Grant's criminal record was expunged—a second civil lawsuit against Grant and others alleging they had conspired to have him indicted for cattle theft. Bennett sought $2 million dollars in compensatory damages, in addition to punitive damages, in that suit.[15]

*Pressuring Grant's Attorney to Resign.* During the course of this litigation, Bennett filed two grievances against Grant's attorney that were dismissed as not alleging professional misconduct. In addition to the grievances, Bennett sued Grant's lawyer, contending he had conspired with Grant and others to have him indicted for cattle theft. The attorney testified that after he was sued by Bennett for $2 million, he was "angry" and "scared" and decided to no longer represent Grant in this suit because "he couldn't do as good a job as somebody that wasn't being sued themselves."

*Tampering With Evidence.* At trial, there were allegations that one of the photos Grant had taken depicted Reynolds' brand on the sold cattle. There were further allegations that Bennett had doctored this photo during his criminal trial to change the incriminating image of his neighbor's brand and conceal his theft. In addition, the San Saba District and County Clerk testified that Bennett attempted to register Reynolds' brand as his own. Finally, during the course of this trial, Bennett—outside the presence of the jury and without permission from the trial court—altered an exhibit depicting a hand-drawn diagram of Reynolds' brand. We conclude these cover-up efforts show culpability and deliberateness and sought to extend and exacerbate harm to Grant by discrediting him as a witness and bolstering Bennett's claims in his civil lawsuits against Grant.[16]

### b. *Harm inflicted was not merely an economic injury and showed a reckless disregard for Grant's health and safety.*

Regarding the first and second reprehensibility factors, Appellants argue Grant suffered a purely economic injury and this is not a case involving physical harm warranting a greater award of exemplary damages, and that his actions do not show an indifference to or

---

[15] Grant, Reynolds, and Miller obtained a favorable summary judgment and sanctions against Bennett, Bonham, and their attorney in that suit, which is currently pending on appeal before this Court in *Bennett, Bonham & Paris v. Reynolds*, No. 03-12-00568.

[16] An award of punitive damages for some of these actions has already been awarded against Bennett in *Bennett I. See Bennett I*, 315 S.W.3d at 876. In that suit, however, he was punished for how his actions affected Reynolds. In this suit, the award of punitive damages is to punish Bennett for how these actions affected Grant. *See id.*

reckless disregard for Grant's health or safety. We disagree. Malicious prosecution is not a purely economic injury; rather, the Restatement recognizes that a plaintiff may recover for the physical harm caused by reason of his arrest. *See* Restatement (Second) of Torts § 671 (1977). Here, Bennett did not intend to inflict a mere financial injury on Grant; rather, he succeeded in having Grant's actual person seized, held in captivity, and stripped of personal liberties. Appellants further contend that: "Bennett's mere desire that Grant serve prison time does not equate to indifference or reckless disregard for Grant's health or safety. . . . At best, this factor is neutral and therefore carries no weight in the reprehensibility analysis." We are confident that if Bennett himself or any person were arrested and facing a prison sentence in Texas, he would not view his health and safety neutrally affected. *See also id.* (maliciously prosecuted plaintiff may recover for impairment to health sustained from arrest).

### c.      *Target of the conduct had financial vulnerability*.

Regarding the third reprehensibility factor, we note that Bennett's actions were further reprehensible because Bennett was aware that Grant and his family were financially vulnerable. Grant testified he first met Bennett because he was desperate for work, and Bennett agreed to hire him as a hand. During the time Grant worked for Bennett, the Bonham Corporation paid him a salary of $1,100 for a full month of work and allowed him to live in a trailer on the property. A salary of $13,200 a year, even when the housing allowance is considered, was hovering on the federal poverty line.[17] Further, Grant's financial situation worsened when his wife and baby were

---

[17] Pursuant to federal poverty guidelines in 2001, a person with two dependents was poverty-stricken if his annual income was less than $14,630. *See* http://aspe.hhs.gov/poverty/01poverty.htm.

in a major traffic accident shortly after Grant turned his photos over to the authorities. Grant and others testified that both his wife and baby were hospitalized after the accident, that his wife had been permanently injured, and that Grant had to take a significant amount of time off from work to stay home and care for her. The record reflects that Bennett was fully aware of the car accident and perhaps attempted to use the situation to take advantage of Grant's financial vulnerability by offering him an extremely lucrative job immediately after the accident under the guise of helping Grant's family. Amidst this backdrop of financial vulnerability, Bennett then began his quest to have Grant imprisoned and ultimately indicted. Further, Grant's indictment carried a prison sentence of two to ten years' imprisonment. *See* Tex. Penal Code §§ 12.34, 15.01, 36.02. Undoubtedly, Bennett's actions threatened to financially ruin Grant and his family.

In sum, we conclude four of the five reprehensibility factors are present in this case and weigh in favor of punitive damages: (1) the harm to Grant resulted from intentional malice, trickery, or deceit; (2) Bennett's malicious prosecution of Grant was not merely an economic injury but resulted in a seizure of Grant's person and loss of physical liberties; (3) Bennett's tortious conduct showed an indifference to and reckless disregard for Grant's health and safety; (4) and his actions threatened to financially ruin Grant. Thus, all but one of the reprehensibility factors weigh in favor of exemplary damages.[18]

---

[18] The remaining reprehensibility factor is whether the defendant's conduct involved repeated actions, not just an isolated incident. For purposes of the reprehensibility analysis, the Texas Supreme Court has found that this factor refers to recidivism and not a course of conduct resulting in a single injury. *See Bennett I*, 315 S.W.3d at 878 n.55. Here, Grant alleges Bennett engaged in a course of conduct resulting in a single injury—his indictment for attempted bribery. There is no evidence in the record that Bennett had engaged in other acts of malicious prosecution demonstrating recidivism.

## 2.     Ratio Between Exemplary and Compensatory Damages

The second and perhaps most commonly cited indicium of an excessive punitive damages award is the ratio between the punitive damages awarded and the actual or potential harm inflicted on the plaintiff. *See BMW of N. Am.*, 517 U.S. at 580. In analyzing this ratio, "the proper inquiry is 'whether there is a reasonable relationship between the punitive damages award and *the harm likely to result* from the defendant's conduct as well as the harm that actually has occurred.'" *Id.* at 581 (quoting *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 460 (1993) (emphasis in original)). Thus, we are to examine the difference between the punitive damages award and the harm actually suffered and the harm "that would have ensued if the tortious plan had succeeded." *See id.*; see also *TXO Prod.*, 509 U.S. at 460. While there is not "a mathematical bright line between the constitutionally acceptable and constitutionally unacceptable [award of exemplary damages] that would fit every case," *see Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 18 (1991), we have been instructed that "few awards exceeding a single-digit ratio . . . will satisfy due process" and that an "award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." *State Farm Mut. Auto. Ins.*, 538 U.S. at 425.

Appellants contend that there is no meaningful distinction between this case and the large punitive damages award the Texas Supreme Court overturned in *Bennett I*, in which the Court found that the ratio of $5,327.11 in actual damages compared to the $250,000 in exemplary damages awarded against Bennett—a ratio of 47:1—and the $1 million exemplary damages awarded against Bonham—a ratio of 188:1—violated due process. *See Bennett I*, 315 S.W.3d at 869. As the U.S. Supreme Court has recognized, however, "a jury imposing a punitive damages award must make a

qualitative assessment based on a host of facts and circumstances unique to the particular case before it. Because no two cases are truly identical, meaningful comparisons of such awards are difficult to make." *TXO Prod.*, 509 U.S. at 458. While this case and *Bennett I* share some nucleus of operative facts, the present case is distinguishable and therefore must be examined on its own facts. In *Bennett I*, the jury found Bennett converted thirteen of his neighbor's cattle and assessed actual damages at the market value of the cattle, $5,327.11. *Bennett I*, 315 S.W.3d at 871. While the Court found that Bennett's malfeasance in attempting to cover-up his initial conversion showed heightened reprehensibility, it concluded:

> At heart, though, this is an economic-injury, actual-harm case seeking recovery for the conversion of thirteen head of cattle. Reynolds alleges a broader "criminal escapade" that aimed to ruin him, but the theoretical possibilities of greater harm strike as marginally relevant at best in assessing exemplary damages, absent proof of the likelihood of such harms.

*Id*. at 877.

In striking contrast, Bennett in this case did not merely steal cattle; rather, he attempted to deprive a man of two to ten years of his liberty. *See* Tex. Penal Code §§ 12.34, 15.01, 36.02 (sentencing for offense of attempted bribery). While Appellants attempt to equate theft of cattle to the theft of years from a man's life, there is no comparison between the two acts. This is reflected in the reprehensibility analysis, in which we concluded that four of the five reprehensibility factors were present in this case. In contrast, in *Bennett I*, the Texas Supreme Court found that Bennett inflicted a purely economic injury on his neighbor by stealing his cattle and therefore only one of the reprehensibility factors—the harm resulted from intentional malice, trickery, or deceit—was present. *See Bennett I*, 315 S.W.3d at 877.

43

Further, and perhaps most important for our discussion, the Texas Supreme Court found that *Bennett I* was an actual-harm case only—meaning that beyond the actual harm suffered by Reynolds from the theft of his cattle, there was only marginal evidence of any other potential harm faced by Reynolds or anyone else as a result of Bennett's conversion. *Id*. Therefore, in *Bennett I*, potential harm was not relevant in the Court's ratio analysis. *See id*. But in this case, the evidence of potential harm is not marginal or speculative; rather, the record conclusively shows that Grant would have been imprisoned for two to ten years if Bennett had succeeded in his illicit scheme. *See* Tex. Penal Code §§ 12.34, 15.01, 36.02. In analyzing the exemplary damages ratio in a potential-harm case, the U.S. Supreme Court has unequivocally instructed us that "[i]t is appropriate to consider the magnitude of the *potential harm* that the defendant's conduct would have caused to its intended victim if the wrongful plan had succeeded." *TXO Prod.*, 509 U.S. at 460 (emphasis in original) (holding dramatic disparity between $19,000 compensatory damages award compared to $10 million exemplary damages award did not violate due process "in light of the [millions] potentially at stake" if the defendant "had succeeded in its illicit scheme"). Thus, U.S. Supreme Court precedent requires us to compare the exemplary damages awarded in this case to both "the harm that has actually occurred" and the potential harm that Grant would have sustained if Bennett's "wrongful plan had succeeded." *See id*.; *see also BMW of N. Am.*, 517 U.S. at 581 ("the proper inquiry is whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred").

Appellants stress in their brief the disparity between the dual $1 million punitive damages awarded in this case compared to the $10,703 compensatory damages award. That disparity

44

lessens, however, when we consider the potential prison sentence faced by Grant. Although it is difficult to place a monetary value on the loss a person experiences from losing years of his life to an erroneous prison sentence, the State compensates persons who have been wrongfully convicted to the tune of $80,000 for each year of wrongful imprisonment plus lifetime annuity payments. *See* Tex. Civ. Prac. & Rem. Code §§ 103.052 (Lump-Sum Compensation), 103.053 (Annuity Compensation). Thus, if Grant had been wrongfully imprisoned for the minimum sentence of two years' imprisonment, he would have been entitled at a bare minimum to a lump-sum payment of $160,000.[19] And, on the high end of the spectrum, he would have been entitled to a lump-sum payment of $800,000 for serving the maximum ten-year sentence, plus potential lifetime annuity payments which could potentially push the final award to over $1 million.[20] Although there is no way to precisely put a dollar value on the potential harm in this case, the State's restitution payments reflect the value the Legislature has placed on a year of life lost to wrongful imprisonment and provide a guidepost for the potential damages in this case.

Based on this analysis, we conclude the potential damages in this case can be prudently and rationally valued at a minimum of $160,000. This is the minimum amount Grant would have received from the State if he had been wrongfully convicted of attempted bribery and served the minimum sentence available. When combined with the actual damages, the total actual

---

[19] Annuity payments would not begin until the first anniversary of this lump-sum payment and would be awarded only if Grant was still living on that date. *See* Tex. Civ. Prac. & Rem. Code §§ 103.151(b), 103.154(b).

[20] The annuity payments are somewhat speculative as they are determined by the number of years a person survives after release from prison. *See id*. § 103.154(b). Unlike the lump-sum compensation, the annuity payments do not transfer upon death to the person's estate. *See id*. §§ 103.151(a), 103.154(b).

and potential damages for this case would therefore be at least $170,703. Using these figures, the ratio between the actual and potential harm compared to the dual $1 million exemplary damages awards would be over 5:1 for both Bennett and Bonham. *See BMW of N. Am.*, 517 U.S. at 581 ("the proper inquiry is whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred"). We note that—even with careful consideration of both the actual and potential damages in this case—this ratio likely exceeds constitutional limits. *See State Farm Mut. Auto. Ins.*, 538 U.S. at 425 ("award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety"). As such, this guidepost weighs in favor of reducing the punitive damages award.

### 3. Legislative Penalties for Similar Misconduct

The final guidepost compares the exemplary damages with legislatively authorized civil penalties in comparable cases. This factor fortifies the notion that legislatures make policy and are well positioned to define and deter undesired behavior. *Bennett I*, 315 S.W.3d at 880. Here, we note there is no comparable civil penalty for Bennett's conduct. We may, however, also look to criminal penalties that could be imposed, as "the existence of a criminal penalty does have bearing on the seriousness with which a State views the wrongful action." *State Farm Mut. Auto. Ins.*, 538 U.S. at 428. When used to determine the dollar amount of an exemplary damages award, though, the U.S. Supreme Court has cautioned us that criminal penalties have "less utility" than civil penalties. *See id.*; *see also Bennett I*, 315 S.W.3d at 881. In this case, we conclude criminal

46

penalties *have* some relevance to our discussion, as they demonstrate that Bennett had fair notice that his conduct could subject him to the following punishment:

- Tampering With or Fabricating Physical Evidence

  - 2 to 10 Year Prison Sentence
  - $10,000 fine

- Aggravated Perjury Before Grand Jury

  - 2 to 10 Year Prison Sentence
  - $10,000 fine

- Execution of a Document by Deception

  - 180 days to 2 years in State Jail
  - $10,000 fine

- Making a False Report to Peace Officer or Law Enforcement Employee

  - Up to 180 Days in State Jail
  - $2,000 fine
  - $16,000 fine for committing offense eight times[21]

Thus, Bennett had fair notice of the seriousness with which the State viewed his wrongful conduct, as his actions could subject him to up to $46,000 in monetary fines and four to twenty-two years' incarceration.[22]

Appellants contend in their brief that we should—as we did on remand from *Bennett I*—reduce the exemplary damages award to the comparable criminal fines. In that case, we

---

[21] Bennett acknowledged at trial that, in his efforts to prosecute Grant, he spoke with at least eight different law enforcement officials on separate occasions.

[22] *See* Tex. Penal Code §§ 32.46 (execution of document by deception), 38.03 (aggravated perjury), 37.09 (evidence tampering), 37.08 (false report).

concluded that the criminal monetary sanction for cattle theft was comparable to the civil offense

of conversion and provided an objective basis for setting a constitutionally permissible exemplary

damages award. *Bennett v. Reynolds*, No. 03-05-00034-CV, 2010 WL 4670270, at *5 (Tex.

App.—Austin Nov. 18, 2010, no pet.) (mem. op.) *supplemented*, 03-05-00034-CV, 2011 WL 182876

(Tex. App.—Austin Jan. 19, 2011, no pet.). In this case, however, there simply is no criminal offense

comparable to the civil offense of malicious prosecution. While we can examine specific criminal

actions Bennett took in his ultimate effort to maliciously prosecute Grant, none of these offenses take

into account that Bennett's ultimate goal was to put Grant in prison.[23] We do, however, conclude

that under this record the applicable prison sentences and fines put Bennett on notice that the State

has a significant interest in deterring this type of conduct and would prosecute and imprison those

who attempt to manipulate the criminal justice system for personal gain.

After careful analysis of these three guideposts, we conclude: (1) four of the five

reprehensibility factors weigh in favor of punitive damages; (2) potential harm is relevant in

evaluating the ratio to exemplary damages, but that even when we consider potential harm, the

resulting ratio of 5:1 likely exceeds constitutional boundaries; and (3) there are no comparable

civil sanctions, but Bennett was on notice that the State had a significant interest in protecting the

---

[23] In truth, for most cases the monetary criminal penalties under the Texas Penal Code have little utility in determining the dollar value of an exemplary damages award. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 428 (2003). The monetary penalty for *all* felonies in Texas, except for capital felony offenses which do not carry any monetary penalty, is a fine not to exceed $10,000. Tex. Penal Code §§ 12.31–.35. There is no variance in the amount of the fine to account for the State's varied interests in preventing and punishing various degrees of reprehensible felony conduct.

integrity of the criminal justice system and would vigorously prosecute, fine, and imprison persons who engaged in such behavior.

Our remaining task is to determine—under the unique facts of this case and these guideposts—what amount of exemplary damages would pass constitutional muster. In this regard, we have been instructed that an award "four times the amount of compensatory damages might be close to the line of constitutional impropriety" and that "[p]ushing exemplary damages to the absolute constitutional limit in a case like this leaves no room for greater punishment in cases involving death, grievous physical injury, financial ruin, or actions that endanger a large segment of the public." *Tony Gullo Motors I*, 212 S.W.3d at 308–310. While we find Bennett's conduct abhorrent, we recognize that his actions did not actually cause any of these enumerated unfortunate circumstances. We do, however, also recognize that the State has a significant interest in punishing and deterring this type of conduct and that Bennett's actions were particularly reprehensible. Weighing these competing concerns, we conclude that a ratio of 3:1 exemplary damages compared to the combined actual and potential damages passes constitutional muster. This results in an award of $512,109 against each defendant (three times the actual and potential damages of $170,703) and reduces the total punitive damages award from $2 million to $1,024,218 ($512,109 against Bonham and $512,109 against Bennett).[24] This award recognizes the potential harm caused by Bennett and

---

[24] When corporate liability is warranted based on the actions of a vice-principal, the Texas Supreme Court has affirmed the propriety of awarding exemplary damages against both the individual vice-principal and his employer. *See Bennett I*, 315 S.W.3d at 869 (affirming exemplary damages awarded against both individual who was corporate principal and corporation itself but remanding because awards were excessive under due process); *see also Qualicare of E. Tex., Inc. v. Runnels*, 863 S.W.2d 220, 224 (Eastland 1993—no writ.) (award of exemplary damages against both employer and vice-principal "is proper and does not impose a double punishment").

Bonham, their reprehensibility, and the State's interest in punishing and deterring, but also leaves room for greater punishment for cases with more egregious injuries.

## SANCTIONS

In addition to the actual and exemplary damages at issue in this suit, Grant alleged Bennett's slander claim against him was frivolous and brought in bad faith for purposes of harassment and sought sanctions. *See* Tex. Civ. Prac. & Rem. Code § 10.001; Tex. R. Civ. P. 13. Bennett originally initiated this suit—as discussed previously—by suing Grant for slander, alleging that Grant's statement that Bennett had stolen Reynolds' cattle was slanderous. The jury found that Grant's statement was substantially true and this finding has not been challenged on appeal. The trial court granted the request for sanctions and ordered Bennett to pay Grant's attorneys' fees incurred defending the claim in the amount of $269,644.50, concluding that this amount adequately punished Bennett and fairly compensated Grant for defending against the groundless claim. In his only individual issue, Bennett contends the sanctions award was an abuse of discretion.

We review the trial court's imposition of sanctions for an abuse of discretion. *See Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007). In reviewing the sanctions order, we review the entire record to determine whether the trial court abused its discretion. *American Flood Research, Inc. v. Jones*, 192 S.W.3d 581, 583 (Tex. 2006). An appellate court may reverse the trial court's ruling only if the trial court acted without reference to any guiding rules and principles, such that its ruling was arbitrary or unreasonable. *Low*, 221 S.W.3d at 614. At the very least, this requires a showing that the trial court based its order on an incorrect interpretation of the law or a clearly erroneous assessment of the evidence. *Robson v. Gilbreath*, 267 S.W.3d 401, 405 (Tex. App.—Austin

2008, pet. denied). The trial court does not abuse its discretion if it bases its sanctions on conflicting evidence and some evidence supports its decision. *Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009).

Here, the trial court's order did not specify the legal basis for the sanctions, so we begin our review by identifying all the potential legal bases for the order. *See Citibank, N.A. v. Estes*, 385 S.W.3d 671, 675 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Chapter 10 of the Civil Practice and Remedies Code, in pertinent part, authorizes a court to sanction a person, a party who represents the person, or both for signing a pleading that was brought for any improper purpose—including to harass, cause unnecessary delay, or needlessly increase the cost of litigation. Tex. Civ. Prac. & Rem. Code §§ 10.001, 10.004; *see Mattox v. Grimes Cnty. Comm'rs Court*, 305 S.W.3d 375, 386 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) ("Sanctions under chapter 10 of the Civil Practice and Remedies Code are authorized if the evidence establishes that . . . a pleading or motion was brought for an improper purpose."). Here, the trial court's order concludes that Bennett filed his slander claim for at least two improper purposes—"to punish a witness who had testified against him in previous lawsuits" and "to subvert a separate trial, [*Bennett I*]." The trial court further concluded that Bennett's refusal to nonsuit his slander claim, "substantially increased the burden on this case on the defendant and on the court system" and "required in essence a re-trial of [*Bennett I*]." As the trial court made findings that Bennett filed this suit for improper purposes specifically prohibited by Chapter 10, we conclude the trial court could have relied on Chapter 10 as the legal basis for the award. Further, Bennett has not challenged on appeal the trial court's finding that he filed this suit against Grant for improper purposes.

51

Generally, an appellant must attack all independent bases or grounds that fully support a complained-of ruling or judgment. *See Britton* , 95 S.W.3d at 681. As Bennett has failed to attack this basis that supports the sanctions order, we cannot conclude the trial court's imposition of sanctions was an abuse of discretion.

In addition, Rule 13 similarly authorizes a trial court to sanction a person, a represented party, or both for signing a pleading that is groundless and brought in bad faith or to harass. Tex. R. Civ. P. 13. Pleadings are presumed filed in good faith under Rule 13, and the burden is on the moving party to demonstrate both that the opposing party's filings: (1) are groundless; and (2) were filed either in bad faith or for the purpose of harassment. *Id*. In determining whether sanctions are appropriate, the trial court must examine the facts available to the litigant and the circumstances existing when the litigant filed the pleading. *Robson*, 267 S.W.3d at 409. Further, under Rule 13, the trial court is required to state in the order the particulars of good cause justifying the sanctions. *See* Tex. R. Civ. P. 13.

The trial court's order here concludes, consistent with a violation of Rule 13, that Bennett's slander claim was "groundless," "part of a plan to harass and intimidate Grant," and brought in "bad faith."[25] As such, we conclude that Rule 13 could have also been the legal basis for the trial court's award. Further, the sanctions order states the particulars of good cause justifying sanctions under Rule 13. First, there are numerous findings in the order that Bennett brought this

---

[25] The trial court also submitted this question to the jury, which concluded that Bennett's suit was groundless and brought in bad faith or for the purpose of harassment. Bennett contends the trial court erred in submitting the sanctions issue to the jury because it was a question of law. Regardless, the sanctions order indicates the trial court made its own findings to support the sanctions order separate from the jury's findings.

52

suit in bad faith and for purposes of harassment, including findings that: (1) Bennett had filed this suit to punish Grant for testifying against him in previous lawsuits; (2) Bennett had "doctored" or "altered" evidence to cover up his conversion of Reynolds' cattle and give grounds to his baseless slander claim against Grant; (3) and that Bennett's true purpose in the suit was not to recover money damages from Grant—who lacked the financial resources to pay an award—but to subvert a separate civil trial, *Bennett I*, and to harass Grant. Bennett does not challenge the legal sufficiency of any of these findings on appeal.

With regard to groundlessness, Bennett pleaded that he had instructed Grant not to sell any cattle that did not belong to him, and therefore, Grant's allegation that he had stolen the cattle was slander. The trial court, however, found in its order that Bennett had converted Reynolds' cattle and then engaged in a "design to cover up his conversion" that implied "willfulness and bad faith, not inadvertence or an honest mistake." This finding states with particularity the trial court's good cause for concluding the slander claim was groundless—as the trial court found there was no factual basis to support Bennett's pleadings that Reynolds' cattle had been sold accidentally and there was no legal basis for his slander claim because substantial truth is a complete defense to slander. *See id.* (groundless means no basis in law or fact and not warranted by good faith argument for change of existing law); *see also Randall's Food Mkt., Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995) (substantial truth of an alleged defamatory statement is complete defense to slander action). Further, while Bennett testified in support of his allegations, the trial court does not abuse its discretion when there is conflicting evidence that supports its decision, s*ee Unifund CCR Partners*, 299 S.W.3d at 97, and Bennett has not challenged the legal sufficiency of this finding on

appeal. In addition, the trial court finds in its order that Bennett's deceit in covering up his wrongdoing by doctoring or altering evidence, "confirms the groundlessness of the slander claim" and was to "further his attempts to give grounds to his baseless harassment of Grant." As such, we cannot agree with Bennett's contention in his brief that the sanctions order "fails to state good cause for finding groundlessness with the particularity Rule 13 requires." Rather, we conclude the sanctions order states with particularity the reasons and circumstances justifying the trial court's finding of good cause to issue sanctions under Rule 13.[26]

Bennett further contends the award of sanctions against him individually was an abuse of discretion because his lawyer signed and filed his pleadings, and "a party should not be sanctioned for its attorney's conduct unless the party is implicated apart from having entrusted its legal representation to counsel." *See Loeffler v. Lytle Indep. Sch. Dist.*, 211 S.W.3d 331, 349–50

---

[26] On rehearing, Bennett contends for the first time that "Grant never noticed any formal hearing on his request for sanctions." *See* Tex. R. Civ. P. 13 (sanctions may be imposed upon motion or upon court's own initiative, after notice and hearing); Tex. Civ. Prac. & Rem. Code § 10.002–3 (same). The record, however, shows that Bennett's counsel was served with notice of the sanctions hearing. Moreover, "the proper method to preserve [Bennett's] notice complaint was to bring the lack of adequate notice to the attention of the trial court at the hearing, object to the hearing going forward, and/or move for a continuance." *See Low v. Henry*, 221 S.W.3d 609, 618 (Tex. 2007). Bennett additionally complains on rehearing that "Grant never filed a formal motion for sanctions." Bennett failed to raise this issue at the trial court or in his appeal. Grant did plead for attorneys' fees based on Bennett's filing of a groundless claim, and the trial court had submitted a jury question asking whether Bennett's slander claim was groundless and brought in bad faith or for purposes of harassment. The jury answered affirmatively. Grant then moved the court to enter final judgment sanctioning Bennett for filing a groundless claim brought in bad or for purposes of harassment. Prior to the court's sanctions order, Bennett also filed a brief with the court contending that he should not be sanctioned because his claims were not groundless nor brought in bad faith or for purposes of harassment. Thus, on the record, Grant moved the trial court to issue sanctions and Bennett plainly had notice of the grounds on which Grant was seeking sanctions and an opportunity to respond.

54

(Tex. App.—San Antonio 2006, pet. denied).  Again, we disagree.  While Bennett's attorneys filed and signed his pleadings, Bennett provided the factual basis for the slander claim and authorized his attorneys to file suit based on those allegations.  Further, the trial court made several specific findings that sanctionable conduct was attributable to Bennett himself[27] and that Bennett had brought the slander suit as revenge for Grant testifying against him in previous suits.  As such, we cannot conclude the trial court abused its discretion in finding that Bennett was implicated in the sanctionable conduct.  Concluding he has failed to prove on appeal that the trial court's award of sanctions was arbitrary or unreasonable, we overrule Bennett's sole individual issue on appeal.[28]

---

[27] The trial court's order provides many instances of Bennett personally implicating himself, including one instance where he—outside the presence of the jury—altered a hand-drawn exhibit depicting Reynolds' brand.  When confronted about the alteration, Bennett claimed he was merely highlighting the exhibit so the jury could see it better, and that it was okay because the Judge was in the courtroom when he made the alteration.  The trial court notes in its order that "although the Judge was present in the room, such alteration was not observed or sanctioned by anyone, the Court included."  In addition to the sanctions expressly authorized by Rule 13 and Chapter 10, the trial court has the inherent power to sanction such bad faith conduct that occurs during the course of litigation. *See Public Util. Comm'n v. Cofer*, 754 S.W.2d 121, 124 (Tex. 1988); *Eichelberger v. Eichelberger*, 582 S.W.2d 395, 398 (Tex. 1979).

[28] We acknowledge that the amount of attorneys' fees awarded as sanctions is significant. Chapter 10 and Rule 13, however, specify that attorneys' fees caused by improper conduct are an appropriate sanction. *See* Tex. Civ. Prac. & Rem. Code § 10.004(c)(3); Tex. R. Civ. P. 13.  Bennett has not raised any challenge to the amount of the award on appeal.  On rehearing, Bennett contends he is entitled to remand to allow the trial court to reconsider the amount of the award in light of the Texas Supreme Court's recent opinion in *Nath v. Texas Children's Hospital*.  *See* 446 S.W.3d 355, 372 (Tex. 2014) (holding that sanctions were warranted but remand was necessary to determine whether, by litigating for over four years before seeking sanctions, the moving party bore some responsibility for the attorneys' fees it incurred).  In *Nath*, however, the sanctioned party preserved error by challenging the excessiveness of the attorneys' fees at the trial court and on appeal. *See* 446 S.W.3d at 361, 364.  Here, Bennett did not raise the issue of excessiveness at the trial court nor on appeal.  Under these circumstances, we cannot conclude he is entitled to remand under *Nath*.

**CONCLUSION**

This is an unusual case. Malicious prosecution itself is an unusual tort, and it is exceptionally unique under Texas jurisprudence for a defendant to procure a prosecution by both providing false information to authorities and by engaging in such other improper activities that his conduct became the determining factor in the decision to prosecute. Looking to the exemplary damages award, this case is also unique because another exemplary damages award, in *Bennett I*, has already been adjudicated by the Texas Supreme Court and found unconstitutional. The facts and circumstances of this case, however, are vastly different than those in *Bennett I* and justify the imposition of a larger exemplary damages award. This case differs from *Bennett I*—and again is somewhat unique under Texas jurisprudence—because it is a potential-harm case and all but one of the five reprehensibility factors are present. As remitted, we are confident the exemplary damages award passes constitutional muster under current federal standards.[29] Accordingly, we reform the trial court's judgment to award Grant $512,109 in exemplary damages against Bennett and $512,109 in exemplary damages against Bonham. We affirm the trial court's judgment as reformed.

_____

Scott K. Field, Justice

Before Chief Justice Rose, Justices Pemberton and Field

Reformed and, as Reformed, Affirmed on Motion for Rehearing

Filed:   March 20, 2015

_____

[29] In response to our opinion issued in this appeal on August 13, 2014, Grant filed with the district court a remittitur reducing his $2 million exemplary damages award against Bennett and Bonham to an award of $512,109 against each defendant. *See* Tex. R. App. P. 46.3.