# IN THE SUPREME COURT OF TEXAS

No. 15-0338

TOM BENNETT AND JAMES B. BONHAM CORPORATION, PETITIONERS,

v.

LARRY WAYNE GRANT, RESPONDENT

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS

**Argued January 12, 2017**

JUSTICE WILLETT delivered the opinion of the Court.

In this latest chapter of a long-running dispute, we consider how the harm likely to result from a malicious prosecution should be evaluated in calculating exemplary damages. We conclude the court of appeals erred in considering the harm that plaintiff would suffer from wrongful imprisonment when the chances of this occurring were essentially zero given the expired statute of limitations. Accordingly, we reverse the portion of the court of appeals' judgment awarding exemplary damages. On all other issues, we affirm.

# I. Background

## A. Factual and Procedural Framework

This suit arises from an infamous cattle-rustling incident in San Saba County.[1] The facts were hotly contested.

The dispute between two ranchers, Thomas O. Bennett and Randy Reynolds, began over fifteen years ago, when thirteen of Reynolds' cattle meandered onto Bennett's land. Instead of returning the cattle to Reynolds, Bennett instructed his ranch hand, Larry Wayne Grant, to round up the cattle and sell them. Grant was hesitant as to the legality of this request and took photographs of the cattle as they were sold. Reynolds learned of the photos and pressured Grant to turn them over to the police.

Grant called Bennett and Bennett's employee, Don Rogers, informing them of the existence of the photos. Grant alleged that he only called to urge them to "make it right" with Reynolds. Bennett, however, charged that Grant tried to blackmail him. Grant admitted that he spoke to Rogers about selling the photos to Bennett, but insisted they only "joked about it." Regardless, a month later, Grant gave the photos to the police. Bennett was indicted for cattle theft. He was eventually acquitted, but he and his company, James B. Bonham Corporation, were found liable in the *Bennett I* civil suit for the converted cattle, resulting in $5,327.11 in actual damages and $1.25 million in exemplary damages.[2]

---

[1] The Court previously dealt with the same underlying facts in *Bennett v. Reynolds*, 315 S.W.3d 867 (Tex. 2010) (*Bennett I*).

[2] We reversed the award of exemplary damages in *Bennett I*.

Today's dispute concerns related litigation between Bennett and Grant. Two years after Grant called Bennett and Rogers about the photos, Bennett brought blackmail charges against Grant to authorities in four separate counties. Bennett admitted it was not until after his criminal trial that he reported the phone call and admitted at trial that his primary "goal" in doing so was to put "Grant in prison . . . for what he's done to me." After the district attorneys in three of the counties refused to prosecute Grant, Bennett met with the district attorney in Navarro County, who referred the case to federal authorities. Bennett was displeased with this outcome and contacted the district attorney again, this time presenting a new theory of attempted theft. The district attorney said these charges were barred because of the two-year statute of limitations. Then, for the first time, Bennett claimed that Grant tried to extort money from him a second time, conveniently falling within the limitations period. At trial of the pending suit, the district attorney testified that he was "skeptical" of the new information because it "appeared that there was maybe some tailoring of the facts going on to fit the statute." The new evidence was also notably missing from Bennett's sworn testimony; instead, Bennett testified that all factual allegations against Grant were based on the original phone call. Because of his suspicions, the district attorney refused to prosecute.

Bennett then met with an attorney who had represented Bonham Corp. for more than twenty years and requested that he write a legal brief concluding that Grant's acts constituted a criminal offense worthy of prosecution. The district attorney said it was this brief, or a subsequent meeting with Bennett, that acted as a "catalyst" convincing him to bring the case to the grand jury. The grand jury, however, was unpersuaded and refused to indict Grant. Undeterred, Bennett again met with Bonham Corp.'s attorney, who advised Bennett to petition for appointment of a special

3

prosecutor in Navarro County to bring the case before the grand jury again. Bennett drafted the petition and acquired 250 signatures from Navarro County residents under a procedure for appointing a special prosecutor.[3] Bennett then met with the district attorney, requesting appointment of his neighbor, Robert Dunn, as special prosecutor. At the time, the district attorney was seeking reelection. Concerned that Bennett's petition drive "wasn't helping" his campaign, he agreed to Dunn's appointment.

The special prosecutor claimed he used his independent discretion in deciding to bring the case before the grand jury a second time. But he acknowledged that the statements from Bennett and Rogers were "very material to [his] decision to proceed to the grand jury." There were some troubling inconsistencies in the information presented to the special prosecutor. Specifically, there is no evidence that Bennett told the special prosecutor about the second alleged extortion attempt (the non-time-barred attempt) as he had represented to the district attorney. Bennett also claimed, for the first time, that Grant had asked him to pay a specific sum—$5,000—for the photos. Additionally, the special prosecutor testified that Bennett spoke to him about secretly taped conversations with Grant that substantiated his $5,000 claim, which the district attorney did not acknowledge in his testimony.

Bennett's quest to imprison Grant seemed promising after the special prosecutor presented the evidence to a second grand jury and obtained two felony indictments. However, nine months later, the indictments were quashed because the charges were barred by limitations. Years earlier, Bennett had initiated the pending civil suit by suing Grant for slander, based on allegations that

---

[3] *Bennett v. Grant*, 460 S.W.3d 220, 230 (Tex. App.—Austin 2015).

Grant had told Reynolds and others that the cattle belonged to Reynolds. After Grant was cleared of criminal charges and his record expunged, he filed a counterclaim in the civil suit for malicious prosecution. A jury found Bennett and Bonham Corp. liable to Grant for malicious prosecution. The trial court awarded Grant $10,703 in actual damages ($5,000 for mental anguish and $5,703 in attorney fees), and $1 million each against Bennett and Bonham Corp. in exemplary damages. The trial court also assessed sanctions of $269,644.50 against Bennett for filing a frivolous slander claim.

Bennett and Bonham Corp. appealed, raising numerous issues. They argued that the jury's malicious-prosecution findings were legally insufficient. They also claimed the jury's awards for actual and exemplary damages were not supported by legally sufficient evidence and that the $2 million exemplary-damages award was unconstitutional. The court of appeals concluded the actual-damage awards enjoyed ample support.[4] However, the court remitted the amount of exemplary damages because the ratio between actual and exemplary damages "likely exceed[ed] constitutional limits."[5] The court of appeals reduced exemplary damages to $512,109 each against Bennett and Bonham Corporation.

### B. Summary of Issues and Our Disposition

Bennett and Bonham Corp.'s arguments can be grouped into three issues: damages, joinder, and sanctions. First, we conclude the jury's award of mental-anguish damages is supported by legally sufficient evidence. However, the exemplary-damages award remains unconstitutionally

---

[4] *Id.* at 241–42.

[5] *Id.* at 252.

excessive, even after it was reformed by the court of appeals. Second, the trial court did not abuse its discretion in allowing Grant to join Bonham Corp. as a defendant. Third, the sanctions awarded against Bennett need not be remanded for reconsideration under *Nath v. Texas Children's Hospital*.[6]

## II. Analysis

Here, Bennett and Bonham Corp. do not challenge the court of appeals' determination that legally sufficient evidence supports malicious-prosecution liability. Instead, they challenge the damages awarded, both actual and exemplary, plus the trial court's joinder and sanctions rulings.

## A. Actual Damages

The trial court awarded actual damages of $10,703: $5,000 in mental-anguish damages, and $5,703 in attorney fees that Grant incurred in defending the criminal charge of attempted bribery.

The petitioners argue there was insufficient evidence to support mental-anguish damages. We disagree. An award for mental anguish must be supported by either (1) a substantial disruption in the plaintiff's daily routine, or (2) evidence of a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger.[7] There must be evidence of the existence of compensable mental-anguish damages and evidence to justify the amount awarded.[8]

---

[6] 446 S.W.3d 355 (Tex. 2014).

[7] *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995).

[8] *Hancock v. Variyam*, 400 S.W.3d 59, 68 (Tex. 2013).

6

Non-economic damages, such as mental-anguish damages, "cannot be determined by mathematical precision; by their nature, they can be determined only by the exercise of sound judgment."[9] As we stated in *Saenz v. Fidelity & Guaranty Insurance Underwriters*,[10] given "the impossibility of any exact evaluation of mental anguish . . . juries [must] be given a measure of discretion in finding damages, [though] that discretion is limited. Juries cannot simply pick a number and put it in the blank. They must find an amount that, in the standard language of the jury charge, 'would fairly and reasonably compensate' for the loss."[11] The amount awarded must be fair and reasonable compensation, given the evidence presented.[12] Admittedly, this standard is simple but not simplistic: "Reasonable compensation is no easier to determine than reasonable behavior—often it may be harder—but the law requires factfinders to determine both."[13] Appellate courts must conduct a meaningful evidentiary review of these determinations.[14]

In *Bentley v. Bunton*,[15] we held there was no evidence to support a $7 million mental-anguish award because it was excessive, unreasonable, and "far beyond any figure the evidence can support."[16] Similarly, in *Saenz*, we rendered a take-nothing judgment because there was no

---

[9] *Bentley v. Bunton*, 94 S.W.3d 561, 605 (Tex. 2002).

[10] 925 S.W.2d 607 (Tex. 1996).

[11] *Id.* at 614.

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] 94 S.W.3d 561 (Tex. 2002).

[16] *Id.* at 607.

evidence that plaintiff suffered any mental anguish or that the $250,000 award was fair and reasonable.[17] This case is distinct from these prior cases, as ample evidence supports the relatively modest award of mental-anguish damages.

Grant's testimony persuasively demonstrates that he suffered a high degree of mental pain and distress. For instance, Grant testified that he knew well before his indictment that Bennett would come after him for showing photos of the stolen cattle to the police. Grant's daily routine was substantially disrupted: He moved four times, trying to keep himself and his family safe from Bennett, built a privacy fence around his property, and even testified that Bennett would appear at depositions with a tape recorder and pencil to obtain Grant's newest address. He was afraid to leave his house and experienced headaches, a weak stomach, a loss of appetite, and sleep deprivation. He stated that he was aware of prior instances where Bennett "had seen that people went to prison." He testified that he fully believed Bennett was capable of doing the same to him, and that he had heard Bennett proclaim he would see Grant "go to the penitentiary." Grant's sister testified that his demeanor had changed significantly, as he closed himself off and became distant from everyone.

In sum, we agree with the court of appeals that sufficient evidence supports Grant's $5,000 mental-anguish award. The $5,703 attorney-fee award is not contested on appeal. Accordingly, we affirm the actual-damages portion of the court of appeals' judgment.

---

[17] *Saenz*, 925 S.W.2d at 614.

## B. Exemplary Damages

The more difficult dispute concerns the exemplary-damages award. As noted, the trial court rendered judgment on the verdict and awarded $1 million each against Bennett and Bonham Corporation. The court of appeals then reduced the damages to $512,109 each. The petitioners claim that even as remitted, the exemplary damages cannot stand. We agree.

Our review first examines the exemplary-damages cap under state law and then evaluates the award's constitutionality under the United States Constitution.

### 1. The Chapter 41 Cap-Busting Exception Applies.

As a general rule, the Texas Civil Practice and Remedies Code restricts the maximum amount of exemplary damages a trial court may award.[18] But this cap does not apply when a plaintiff seeks exemplary damages based on certain felony criminal conduct.[19] The court of appeals properly held that this case falls under an exception to the cap, namely securing execution of a document (the indictment) by deception.[20] This is a felony under Penal Code section 32.46, which states: "A person commits an offense if, with intent to defraud or harm any person, he, by deception . . . causes another to sign or execute any document affecting property or service or the *pecuniary* interest of any person."[21]

---

[18] *See* TEX. CIV. PRAC. & REM. CODE § 41.008(b).

[19] *Id.* § 41.008(c).

[20] *Id.* § 41.008(c)(11).

[21] TEX. PENAL CODE § 32.46(a) (emphasis added).

Bennett and Bonham Corp. argue that an indictment affects a *liberty* interest but not a *pecuniary* interest as contemplated by section 32.46. Although the Penal Code does not define "pecuniary interest," Texas courts have interpreted it to mean a financial or monetary stake in the matter.[22] The petitioners contend that because an indictment is a formal accusation of a crime and does not directly affect a person's monetary interest, it falls outside the exception. The statute, however, does not by its terms require the document in question to "directly" affect a person's pecuniary interest. Further, while it is true that an indictment is different in kind from financial documents like a bank draft or a promissory note, the statutory text does not require that the complainant have a pecuniary interest in the document itself; rather the document must *affect* the complainant's pecuniary interest.[23]

We agree with the court of appeals that when viewing the evidence in the light most favorable to the jury's finding,[24] there is more than a mere scintilla of evidence that Grant's pecuniary interest was affected by the indictment. Grant was required to post a $10,000 bond immediately to avoid imprisonment and to hire attorneys to quash the indictment. And if convicted of attempted bribery, he could face up to $10,000 in penalties. The court of appeals correctly applied Chapter 41's cap-busting exception.

---

[22] *See Briones v. State*, 76 S.W.3d 591, 595 (Tex. App.—Corpus Christi 2002, no pet.*)*; *Goldstein v. State*, 803 S.W.2d 777, 791 (Tex. App.—Dallas 1991, writ ref'd).

[23] *See Lewis v. State*, No. 05-09-00299-CR, 2010 WL 4400515, at *2 (Tex. App.—Dallas Nov. 8, 2010, pet. ref'd).

[24] *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005) (stating that when conducting a legal-sufficiency review, a court should consider the evidence in the light most favorable to the judgment).

## 2. The Exemplary-Damages Award Is Unconstitutionally Excessive.

There is, however, a problem with the court of appeals' analysis of the award's constitutionality. The petitioners contend the remitted dual $512,109 exemplary-damages awards are excessive and violate federal due process. We agree.

As an overarching premise, exemplary damages further the state's interest in punishing and deterring unlawful conduct. But this punishment should not be so grossly excessive as to "further[] no legitimate purpose and constitute[] an arbitrary deprivation of property."[25] Therefore, even if the Texas cap on exemplary damages is inapplicable, there remains a federal constitutional check on the award, as explicated by the United States Supreme Court.[26] We must consider three guideposts when reviewing an exemplary-damages award: (1) the degree of reprehensibility of the misconduct; (2) the disparity between the exemplary-damages award and the actual harm suffered by the plaintiff or the harm likely to result; and (3) the difference between the exemplary damages awarded and the civil or criminal penalties that could be imposed for comparable conduct.[27] Reviewing the constitutionality of an exemplary-damages award is a question of law we review de novo.[28]

---

[25] *Bennett I*, 315 S.W.3d 867, 873 (Tex. 2010) (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417 (2003)).

[26] *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 562 (1996) (stating that the Due Process Clause of the Fourteenth Amendment prevents a state from granting a "grossly excessive" punishment); *State Farm*, 538 U.S. at 418 (setting forth a three-part test for constitutional exorbitancy).

[27] *State Farm*, 538 U.S. at 418.

[28] *Bunton v. Bentley*, 153 S.W.3d 50, 54 (Tex. 2004).

We agree with the court of appeals' analysis of the first guidepost. Evaluating reprehensibility requires consideration of whether: (1) the harm inflicted was physical rather than economic; (2) the tortious conduct showed an indifference to or reckless disregard for the health or safety of others; (3) the target of the conduct had financial vulnerability; (4) the conduct involved repeated actions; and (5) the harm resulted from intentional malice, trickery or deceit.[29] There is significant evidence indicating that the petitioners' conduct satisfies at least the four latter factors. These factors are nonexclusive, and the finding of four of them supports an award of exemplary damages.

Similarly, we agree with the court of appeals' analysis of the third guidepost. This prong requires us to compare the exemplary damages with legislatively authorized civil penalties in comparable cases. Here, because there is no analogous civil penalty for Bennett's actions, we look to potential criminal penalties, although criminal penalties are viewed as less instructive than potential civil penalties.[30] The court of appeals cited various criminal penalties of which Bennett had fair notice, including tampering with or fabricating physical evidence, aggravated perjury before a grand jury, execution of a document by deception, and making a false report to a peace officer or law enforcement employee. These crimes could result in $46,000 in fines and up to twenty-two years of imprisonment. Thus, although there are no comparable civil penalties for Bennett's conduct, Bennett was on notice that the State had a substantial interest in preventing improper use of the criminal justice system and would punish those who sought to sully it.

---

[29] *State Farm*, 538 U.S. at 419.

[30] *Id.* at 428.

Our disagreement with the court of appeals' analysis relates to the second guidepost: analyzing the ratio between the exemplary damages awarded and the actual harm suffered by the plaintiff or the harm likely to result. While there is no bright-line rule for the ratio, the United States Supreme Court has indicated that few awards exceeding a single-digit ratio satisfy due process standards.[31] In *Bennett I*, we noted that a ratio above 4:1 "might be close to the line of constitutional impropriety."[32] Here, the ratio is initially troublesome. The compensatory damages total $10,703, and the exemplary damages are $512,109 against each defendant, giving us a ratio of nearly 48:1.

In evaluating whether the ratio is excessive, we must ask "whether there is a reasonable relationship between the punitive damages award and *the harm likely to result* from the defendant's conduct as well as the harm that has likely occurred."[33] This requires a three-part inquiry, looking at (1) the exemplary damages awarded, (2) the actual damages, defined as the harm that has likely occurred, and (3) "potential damages," defined by the United States Supreme Court as the harm likely to result from defendant's conduct.[34] For the potential damages here, the burden of proof is on Grant to show to a probability, not merely to a speculation, that he would suffer these damages.

---

[31] *Id.* at 425.

[32] *Bennett I*, 315 S.W.3d 867, 878 (Tex. 2010) (quoting *State Farm*, 538 U.S. at 425).

[33] *TXO Prod. Corp. v. Alliance Res. Corp.,* 509 U.S. 443, 460 (1993) (emphasis in original).

[34] *See, e.g.*, *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 582 (1996) (narrowing the terms "potential" damages and "potential" harm to mean damages/harm likely to result); *Philip Morris USA v. Williams*, 549 U.S. 346, 354 (2007) (same); *State Farm*, 538 U.S. at 410 (same); *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 440 (2001) (same); *United States v. Bajakajian*, 524 U.S. 321, 346 (1998) (same); *TXO*, 509 U.S. at 460 (same).

Bennett and Bonham Corp. assert the court of appeals articulated two conflicting standards for determining potential harm: (1) analysis of the harm likely to result from the defendant's bad acts, versus (2) analysis of the harm that would have ensued if the tortious plan had succeeded. There is no conflict; rather, the latter is an example of the former. The United States Supreme Court clarified as much in *Gore*, rephrasing "harm likely to result" as "the harm to the victim that would have ensued if the tortious plan had succeeded."[35] The High Court used them interchangeably, not alternatively. Simply put, there is no "objective likelihood" standard for determining potential harm pitted against a "what actually would have happened" standard. Any wording differences are semantic, not substantive.

The court of appeals properly articulated that potential harm is the harm likely to result from the defendant's conduct. But it improperly included the consequences of wrongful imprisonment in its calculations, such as the compensation the State provides to those wrongfully convicted. It figured that if Grant had been wrongfully imprisoned for two years, the statutory minimum for this crime, the State would pay him $160,000 under a statutory compensation scheme available to defendants wrongfully convicted. Similarly, if he received the maximum sentence of ten years' imprisonment, the State would pay him $800,000, as well as potential lifetime annuity payments. Following this logic, the damages could exceed $1 million. The court of appeals then concluded "the potential damages in this case can be prudently and rationally valued at a minimum of $160,000," as this is "the minimum amount Grant would have received from the State if he had

---

[35] *Gore*, 517 U.S. at 581.

14

been wrongfully convicted of attempted bribery and served the minimum sentence available."[36] Therefore, combining the actual and potential damages would total $170,703, making the ratio 5:1. The court of appeals held that this ratio exceeded constitutional limits and reduced the exemplary-damages award to $512,109 against each defendant, resulting in a 3:1 ratio.

The court of appeals was right to remit, but the remittitur was not enough. The problem was the court's consideration of Grant's possible prison sentence at all. When evaluating potential harm, the court should have looked to the harm likely to result from Bennett's conduct. Here, there was essentially zero likelihood of imprisonment because the statute of limitations barred the claim against Grant. Therefore, the potential harm analysis should have only focused on the probable damages resulting from the malicious prosecution, not the consequences of wrongful imprisonment. When concentrating solely on the likely harm from malicious prosecution, it is appropriate to consider, for example, that Grant would incur attorney fees in defending himself against criminal charges. It is also fair to consider time taken away from one's job by having to participate in criminal proceedings.

Grant bore the burden to prove the criminal justice system would ultimately fail to resolve this case correctly. He failed to meet this burden, providing no evidence that he could be convicted, let alone imprisoned, exonerated, and fully compensated. Indeed, the statute of limitations barred any claim against Grant, and there was effectively no chance he would be imprisoned. As the court of appeals recognized, "Bennett's long and hard-fought quest ended nine months later, when both of Grant's indictments were quashed because the charges had been filed past the statute of

---

[36] *Bennett v. Grant*, 460 S.W.3d 220, 252 (Tex. App.—Austin 2015).

limitations."[37] Grant failed to show imprisonment was likely to result from Bennett's conduct, and the court of appeals was wrong to consider imprisonment-related damages.

We recognize the State's tremendous interest in preventing malicious prosecution and wrongful imprisonment. But these wrongs are not synonymous, and should not be treated as such. Here, Grant had the burden to prove that imprisonment was likely— an impossible burden given the preclusive effect of limitations. The court of appeals engaged in speculation when making its calculations, contrary to the definition of potential harm provided by the United States Supreme Court. We thus reverse and remand the exemplary-damages award to the court of appeals for a more substantial remittitur.

### C. Joinder

Procedural matters, such as joinder and the consolidation of claims, are left to the discretion of the trial court, whose rulings will not be overturned absent an abuse of discretion.[38] An abuse of discretion occurs when the trial court "acted without reference to any guiding rules and principles."[39] Bonham Corp. argues the trial court erred by allowing Grant to join it as a third-party defendant under Rule of Civil Procedure 38(a). While Bonham Corp. is correct that Rule 38(a) does not apply here, the joinder does not amount to an abuse of discretion. Also, Bonham Corp. waived this issue by not complaining of misjoinder to the trial court.

---

[37] *Id.* at 232.

[38] *Allison v. Ark. La. Gas Co.,* 624 S.W.2d 566, 568 (Tex. 1981).

[39] *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004) (quoting *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985)).

16

Joinder is appropriate given the background of this case. After Grant revealed the cattle photos to police and Reynolds sued Bennett for conversion, Bennett sued Grant for slander. Grant counterclaimed, alleging Bennett was liable to him for intentional infliction of emotional distress. Because Grant failed to join Bonham Corp. within thirty days after filing his original answer, the trial court rejected his initial effort to join Bonham Corp. as a third-party defendant. The trial court instructed Grant to seek leave "pursuant to Rule 38" before trying again. Grant subsequently filed a "Motion for Leave to Include James B. Bonham Corporation." This motion did not include the specific rule under which Bonham Corp. should be joined, but it did explicitly request leave "to file a third-party action" against Bonham Corp. for intentional infliction of emotional distress. It did not allege that Bonham Corp. was liable for any part of Bennett's slander claim against Grant. The trial court granted joinder, but did not specify the grounds for doing so. Bonham Corp. then filed its original answer to Grant's counterclaim. After the wrongful indictment was filed against Grant, Grant amended his counterclaim against Bennett and Bonham Corp. to add malicious prosecution. Bonham Corp., in response, filed its original answer to the new counterclaim and did not argue that it was wrongly joined.

Here, Grant did not request joinder under a specific rule, and the trial court did not specify a rule when it granted joinder. Rule 38(a) states that a defendant may join a third party who may be liable to the defendant or to the plaintiff for all or part of the plaintiff's claims against the defendant.[40] Joinder on these grounds would be improper here, as Grant did not allege that Bonham Corp. was liable to Bennett for any part of Bennett's slander claim against Grant.

---

[40] Tex. R. Civ. P. 38(a).

However, joinder was permissible under other rules. For instance, under Rule 37, joinder of "additional parties necessary or proper parties to the suit" is permitted.[41] Additionally, under Rule 39, joinder of an additional party is permitted if "in his absence complete relief cannot be accorded among those already parties."[42] Further, under Rule 40, permissive joinder of parties as defendants is allowed if a plaintiff or counter-plaintiff asserts against them "any right to relief . . . arising out of the same transaction [or] occurrence."[43] We agree with the court of appeals that trial courts have broad discretion in determining whether parties should be joined.[44] Because the trial court did not specify the rule on which it relied, and because there are several grounds on which joinder would be permissible, there was no abuse of discretion.

Further, Bonham Corp. waived this issue because it did not object to joinder before the trial court. Generally, an issue presented in a petition for review before this Court must have "been preserved for appellate review in the trial court and assigned as error in the court of appeals."[45] Bonham Corp. did not object to joinder in the trial court, but rather complained for the first time in the court of appeals. Joinder is an issue that arises in the trial court, and to preserve error, Bonham Corp. was required to present its objection there. Because it failed to do so, Bonham Corp. has waived the issue in this Court.

---

[41] TEX. R. CIV. P. 37.

[42] TEX. R. CIV. P. 39.

[43] TEX. R. CIV. P. 40.

[44] *Bennett v. Grant*, 460 S.W.3d 220, 238 (Tex. App.—Austin 2015).

[45] *G.T. Leach Builders, LLC v. Sapphire V.P., LP*, 458 S.W.3d 502, 516–17 (Tex. 2015) (quoting TEX. R. APP. P. 53.2(f)).

## D. Sanctions

The trial court signed an order sanctioning Bennett "for filing a groundless slander claim against [Grant] in bad faith and for the purpose of harassment." The trial court determined that Grant should receive $269,644.50 in litigation costs for defending Bennett's slander claim and conditional appellate attorney fees. This sanction was included in the final judgment. The court of appeals affirmed the sanctions.

We review the imposition of sanctions for abuse of discretion.[46] As noted above, a trial court abuses its discretion if it acts without reference to any guiding rules or principles.[47] In *Low*, this Court articulated several factors for trial courts to consider when awarding sanctions.[48] The courts need not consider every factor, but they should consider all relevant factors.[49] Bennett contends the sanctions against him should be remanded for reconsideration under *Nath v. Texas Children's Hospital*.[50]

In *Nath*, the trial court imposed sanctions on Nath for frivolously filing a lawsuit against a hospital and based the amount on the hospital's attorney fees.[51] Nath appealed, alleging the sanctions were excessive.[52] We held the hospital was responsible for some of its attorney fees

---

[46] *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007).

[47] *Id.*

[48] *Id.* at 620 n.5.

[49] *Id.* at 620–21.

[50] 446 S.W.3d 355 (Tex. 2014).

[51] *Id.* at 361.

[52] *Id.*

because it litigated the case for five years before moving for summary judgment based on the statute of limitations, which could have been brought years earlier.[53] In *Nath*, "the degree to which the offended person's own behavior caused the expenses for which recovery is sought" was a relevant factor.[54]

Bennett's reliance on *Nath* is misplaced. Here, although the litigation was frivolous as Grant alleged in his original answer, he could not have ended the litigation sooner because there was no determinative legal question as existed in *Nath*. Evaluating whether the litigation was frivolous required a factfinder to determine whether Bennett lied and the suit was brought in bad faith. In fact, the jury answered this very question in their jury charge.[55] Accordingly, Bennett's sanctions award should be upheld.

### III. Conclusion

We reverse the exemplary-damages portion of the court of appeals' judgment and remand to that court for remittitur in light of this opinion. In all other respects, we affirm the court of appeals' judgment.

_____
Don R. Willett
Justice

**OPINION DELIVERED:** April 28, 2017

---

[53] *Id.* at 372.

[54] *Id.*

[55] Question 19 of the jury charge asked: "Was the Plaintiff Tom Bennett's suit against Larry Grant groundless, and brought in bad faith or for the purpose of harassment?" The jury answered "yes."